UNITED STATES of America, Plaintiff,

v.

MARYLAND COOPERATIVE MILK PRODUCERS, Inc., and Maryland and Virginia Milk Producers Association, Inc., Defendants.

No. 992–55.

United States District Court District of Columbia.

Oct. 16, 1956.

**152**

Joseph J. Saunders, Edna Lingreen, and Joe E. Waters, Department of Justice, Washington, D. C., for the United States.

Philip B. Perlman, Ellis Lyons, Washington, D. C., and Harry Troth Gross, Baltimore, Md., for defendant Maryland Cooperative Milk Producers, Inc.

William J. Hughes, Jr., Herbert Bergson, and Herbert Borkland, Washington, D. C., for defendant Maryland & Virginia Milk Producers Ass'n, Inc.

HOLTZOFF, District Judge.

This is the trial of an indictment charging violations of the antitrust laws. The trial is before the Court, a jury having been waived.

There are two defendants in this case, Maryland Cooperative Milk Producers, Inc., and Maryland and Virginia Milk Producers Association, Inc. Each defendant is an association of producers of milk. The Maryland Cooperative Milk Producers, Inc., is located in Baltimore, Maryland, and is composed of about 2,000 farmers who are producers of milk which they ship to distributors in the Baltimore metropolitan area. Maryland and Virginia Milk Producers Association, Inc., is located in Washington, D. C. and consists of about 1,950 members, who are producers shipping milk to distributors in the Washington metropolitan area.

The two defendants are charged with an unlawful combination and conspiracy to fix prices for milk sold to distributors which, in turn, is supplied by the purchasers to the Government at its military post at Fort Meade, Maryland.

The indictment consists of two counts. The first count charges a violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1, namely, an unlawful restraint of interstate commerce. The second count charges a violation of Section 3 of the Sherman Act, 15 U.S.C.A. § 3, namely, an unlawful restraint of commerce between the District of Columbia and several of the States.

It appears, in passing, that the prices charged for milk intended for resale to the Government at Fort Meade were actually lower than those exacted for milk destined for resale to the general public. It may be said perhaps, in a sense, that the defendants are accused of conspiring to undercharge the Government. In justice to counsel for the Government, it must be said, however, that they contend that, in a free competitive market, prices on Government sales might have been even lower than those claimed to have been fixed by the defendants. Attention is called to the fact, by Government counsel, that milk intended for use at Fort Meade was surplus milk that had to comply merely with the standards prescribed by the United States Public Health Service instead of with the more rigorous and rigid requirements established by the Government of the District of Columbia.

After the opening statements were made, the Government commenced to introduce evidence. It offered a stipulation of facts previously agreed upon by counsel. At that point, counsel for the defendants made a motion for judgment of acquittal.

█ A word should be said about the procedural aspects of the matter. Ordinarily, such a motion, unless based solely on the opening statement of Government counsel, may not be entertained until the Government closes its case. An exception is proper, however, if at an earlier stage basic facts appear inescapably leading to the conclusion that, irrespective of whatever other evidence may be introduced, the prosecution must fail. In that event, it is proper to stop the further introduction of evidence and entertain a motion for judgment of acquittal. Such a course is in the interest of efficiency and expedition in the administration of justice. It is on this basis that the Court entertained the defendants' motion in this instance as soon as the stipulation of facts was tendered and admitted.

The following facts appear from the stipulation that are pertinent to this dis-

cussion. Each defendant is a corporation without capital stock and is an association composed of milk producers. Each defendant is operated for the mutual benefit of its members and is not conducted for profit. In brief, the object of each association is to handle and market the milk produced by its members.

It is well established that an agreement to fix prices is, in and of itself, an unreasonable restraint of trade and is illegal, per se, and therefore violative of the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note. This was held by the Supreme Court in the leading case of United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 211 to 233, 60 S.Ct. 811, 84 L.Ed. 1129.

The question presented here, however, is whether the defendants in this case are exempt from this broad rule. Defendants claim that they are. It will be recalled that the Sherman Act became law in 1890. In 1914, its broad provisions were, in part, limited and, in part, supplemented by the Clayton Act, 15 U.S.C.A. § 12 et seq.

Section 6 of the Clayton Act is pertinent to the question involved in this case, 15 U.S.C.A. § 17. The relevant provisions of the Clayton Act read as follows:

"Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organization, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."

Thus, farmers and farmers' cooperatives became a favorite of the law, in a sense. They were granted an express exemption and received a special dispensation from the antitrust laws. They may lawfully combine with impunity and may legally agree to fix prices on their products.

Some years ago, an attempt to prosecute an agricultural cooperative as an unlawful monopoly met with failure; United States v. Dairy Cooperative Association, D.C., 49 F.Supp. 475. In that case, Judge McColloch for the District of Oregon made the following pungent observations:

"It may be that the acts of the defendant cooperative in this case, tested without regard to the provisions of the Clayton Act, are monopolistic in character. I have not given serious thought to that question, for it seems to me when Congress said that cooperatives were not to be punished, even though they became monopolistic, it would be * * * ill-considered for me to hold to the contrary."

It must be observed that to be sure the exemption of agricultural associations from the prohibition of the antitrust laws does not extend to a combination between agricultural associations and persons or entities that are not in this category. This was held by the Supreme Court in United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181. Chief Justice Hughes, in writing for a unanimous bench, emphatically called attention to the fact that the conspiracy charged in that case was not that of merely forming a collective association of producers to market their products but a conspiracy between producers and distributors and allied groups with labor officials, municipal officials, and others.

The Government argues that the exemption contained in the Clayton Act does not apply to a combination of two or more agricultural cooperatives and urges that such a combination is within the rule of the Borden case.

This Court is of the opinion that this contention cannot be sustained. The ob·

vious purpose of the Clayton Act was to liberate combinations of farmers and their cooperative organizations from the prohibitions of the antitrust laws as long as they do not combine with others who are outside of this category. It seems immaterial whether a large group of farmers organizes a single organization or divides itself into several organizations. Their joint activity, whether in the form of a single association or two or more associations, is not an illegal combination in restraint of trade in the light of the provisions of the Clayton Act. Surely, the legality of the actions of a group of farmers should not depend on such a nebulous consideration as the question whether they found it convenient to organize a single large cooperative or two smaller groups. The effect of the joint action is the same in either event and should be tested by the same yardstick. The exemption should be construed as applicable to a group of farmers irrespective of whether they are joined into a single cooperative or into several cooperative associations acting jointly. Any other construction would result in partially defeating the intent of the Congress and frustrating the meaning of the Act.

We were admonished centuries ago that, "The letter killeth but the spirit giveth light".

Even a strict literal construction of the statute, however, leads to the same conclusion. It provides, in part, that:

"Nor shall such organizations or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade".

It will be observed that the plural, as well as the singular, are included.

This discussion might reasonably end at this point were it not for the fact that later statutes affirmatively support the construction of the Clayton Act which this Court has just reached.

In 1922, eight years after the passage of the Clayton Act, the so-called Capper-Volstead Act became law, 7 U.S.C.A. § 291. The pertinent provisions of that statute read as follows:

"Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes: Provided, however, That such associations are operated for the mutual benefit of the members thereof, as such producers, and conform to one or both of the following requirements:

"First. That no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein, or,

"Second. That the association does not pay dividends on stock or membership capital in excess of 8 percentum per annum.

"And in any case to the following:

"Third. That the association shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members."

The stipulation of facts in this case shows that these defendants comply with the proviso of the Capper-Volstead Act. It will be noted that the Act permits agricultural cooperatives to have marketing agencies in common. Obviously, it must have been contemplated that a common marketing agency would fix the same prices for the products of all of its principals and would not discriminate among them. Consequently, it must have been foreseen that this provision would, in some cases, lead to the fixing of prices of agricultural commodities.

The conclusion is inescapable that Congress had no intention to prohibit agreements between two or more cooperatives fixing prices for their products. It should be noted, in passing, that to prevent possible abuses the Secretary of Agriculture was empowered to issue cease and desist orders if he found that such an association monopolizes or restrains trade in interstate or foreign commerce to such an extent that the price of any agricultural product is unduly enhanced thereby. Such an order is subject to judicial review, 7 U.S.C.A. § 292.

In 1926, these provisions were further fortified by the Co-operative Marketing Act, 7 U.S.C.A. § 455, which provides as follows:

"Persons engaged, as original producers of agricultural products, nut or fruit growers, ranchmen, dairymen, such as farmers, planters, acting together in associations, corporate or otherwise, in collectively processing, preparing for market, handling, and marketing in interstate and/or foreign commerce such products of such persons so engaged, may acquire, exchange, interpret, and disseminate past, present, and prospective crop, market, statistical, economic, and other similar information by direct exchange between such persons, and/or such associations or federations thereof, and/or by and through a common agent created or selected by them.":

It will be observed that again the use of a common agent is expressly permitted although, of necessity, the use of a common agent may inevitably lead to a fixing of prices. It will also be noted that this statute applies expressly to federations of cooperatives as well as to cooperatives.

The Court concludes that a combination between two or more agricultural cooperatives to fix prices of their products is exempt from the antitrust laws provided that no other person that is not such an organization or a member of such a group is a part of the combination.

Accordingly, the motion of defendants for judgment of acquittal is granted and an order will be entered accordingly.