497 F.2d 203
 1974-1 Trade Cases 75,017
 TREASURE VALLEY POTATO BARGAINING ASSOCIATION et al.,
Plaintiffs-Appellants,
v.
ORE-IDA FOODS, INC. and J. R. Simplot Company, Defendants-Appellees.
TREASURE VALLEY POTATO BARGAINING ASSOCIATION,
Plaintiff-Cross-Appellee,
v.
ORE-IDA FOODS, INC., Defendant-Cross-Appellant.
TREASURE VALLEY POTATO BARGAINING ASSOCIATION,
Plaintiff-Cross-Appellee,
v.
J. R. SIMPLOT COMPANY, Defendant-Cross-Appellant.
 Nos. 71-2742 to 71-2744.
 United States Court of Appeals, Ninth Circuit.
 April 11, 1974.
 
 Joseph M. Alioto (argued), Peter J. Donnici, Joseph L. Alioto, Law Offices of Joseph L. Alioto, San Francisco, Cal., Howard D. Humphrey, Clemons, Cosho, Humphrey & Samuelsen, Boise, Idaho, for plaintiff-cross-appellee.
 William Simon (argued), Donald J. Gavin, John Bodner, Jr., Howrey, Simon, Baker & Murchison, Washington, D.C., Eugene C. Thomas, Moffatt, Thomas, Barrett & Blanton, Boise, Idaho, for defendant-cross-appellant.
 Carl J. Schuck (argued), George Christensen, Overton, Lyman & Prince, Los Angeles, Cal., Jess B. Hawley Jr., Hawley, Troxell, Ennis & Hawley, Boise, Idaho, for defendant-cross-appellant Simplot.
 Before CARTER, GOODWIN and WALLACE, Circuit Judges.
 JAMES M. CARTER, Circuit Judge:
 
 
 1
 This is a private action for treble damages under the antitrust laws. The plaintiffs grow potatoes and sell them to the defendants; the defendants turn these raw potatoes into frozen french fries and resell them. In 1966 the action was initiated by the plaintiffs, charging inter alia that the defendants had conspired from 1963 to 1966 to fix the prices at which they would purchase the plaintiffs' potatoes. The defendants charged by counterclaim that the plaintiffs themselves had combined in violation of the Sherman Act. The district court, after a trial without a jury decided that neither side had violated the law. We affirm.
 
 
 2
 The issues, broadly speaking, are four: (1) does the evidence compel a finding that the defendants (appellees) combined and conspired a violation of 1 of the Sherman Act; (2) does the evidence compel a finding that the defendants monopolized or attempted to monopolize the relevant market in violation of 2 of the Sherman Act; (3) in regard to the defendants' counterclaim, did the trial court court err in concluding that 6 of the Clayton Act exempted the plaintiffs (cross-appellees) from the antitrust laws; and (4) did the court err in refusing an injunction on the counterclaim on the ground that the defendants (cross-appellants) established no reasonable basis for determining damages.
 
 Facts
 
 3
 The plaintiffs, individual potato growers in Idaho and Oregon, bring this action in their own behalf and as representatives of all other persons and businesses in Malheur County, Oregon, and in ten southwestern counties of Idaho, who sold potatoes to the defendants by preseason contract[1] during 1963 to 1966. Essentially this class consists of members of the Treasure Valley Potato Bargaining Association and the Malheur Potato Bargaining Associations.[2]
 
 
 4
 These two associations, each composed of several hundred potato growers, are in the business of representing their individual members on a collective basis in negotiations with potato processors. An individual member is prohibited from selling his potatoes under a preseason contract unless the contract is approved by his association.
 
 
 5
 The defendants, Ore-Ida Foods, Inc., and J. R. Simplot Company, are potato processors. Ore-Ida has a processing plant in Ontario, Oregon, and Simplot has one in Caldwell, Idaho. Other potato processors in the area, competitors of Ore-Ida and Simplot, were not named as defendants.
 
 
 6
 During 1963 to 1966, Ore-Ida and Simplot purchased raw potatoes both by preseason contract and by purchase on the open market. They made these potato procurements from growers in Idaho and Oregon and also from growers in other states. Although they bought large amounts of potatoes from members of Treasure Valley and Malheur, they also purchased from growers who were not members.
 
 
 7
 This litigation arises from the activity leading up to the formation of preseason contracts between the defendants and the growers in the plaintiff class.
 
 
 8
 Officers and members of Treasure Valley and Malheur met with each other often during 1963 to 1966 to discuss the prices and the terms of sale that each association, during its separate negotiations with the potato processors, would seek to obtain for its members in preseason contracts. The two associations agreed to seek similar terms.
 
 
 9
 Generally, Malheur would be the first to bargain with Ore-Ida. After those two had reached an agreement, Treasure Valley would negotiate with Ore-Ida and seek to obtain the same terms for its members. In a similar fashion, Treasure Valley would be the first to bargain with Simplot, and Malheur would follow, seeking to obtain the same terms for its members selling to Simplot.
 
 
 10
 There was normally true bargaining over only the first preseason contract formed, whether it was between Malheur and Ore-Ida, or Treasure Valley and Simplot. Once the terms of that first contract were established, both processors would routinely refuse to give better terms in subsequent contracts that year, and both associations would usually refuse to accept worse terms.
 
 
 11
 The negotiations over preseason contracts were widely publicized in the agricultural community of Idaho and Oregon. Newspapers and radio frequently reported the prices and other terms being offered. The growers talked freely with each other about the status of the negotiations, and exchanged information with employees of the processors. Without doubt, the parties were 'bargaining in sunshine.'
 
 
 12
 The plaintiffs contended the defendants bargained illegally. In particular, the plaintiffs alleged (1) that Simplot and Ore-Ida agreed with each other to fix the prices they would offer the plaintiffs; (2) that Simplot and Ore-Ida occasionally boycotted the potatoes grown by the officers of the bargaining associations when the officers proved hardnosed at the bargaining table; and (3) that Simplot and Ore-Ida allocated growers between them.
 
 
 13
 Such alleged conduct, contended the plaintiffs, involved a combination unreasonably in restraint of trade, thus violating 1 of the Sherman Act, and constitutes a monopolization or attempted monopolization of the relevant market, thus violating 2 of the Act.[3]
 
 
 14
 Simplot and Ore-Ida, not content with merely defending against the plaintiffs' remaining claims, asserted in a counterclaim that the bargaining association had combined and conspired in restraint of trade.
 
 
 15
 After a trial without a jury, in which the court liberally received abundant quantities of documentary and oral evidence, the court made its findings of fact and conclusions of law. In brief, the court held that Simplot and Ore-Ida did not directly or indirectly, expressly or impliedly, enter into any agreement in restraint of trade, and they did not monopolize or attempt to monopolize trade. Concerning the counterclaim, the court held that the bargaining activity of the associations and their members was immunized by reason of 6 of the Clayton Act; and that, in any event, the proffered evidence of Ore-Ida and Simplot as to measure of damages was based on speculation and conjecture and was insufficient to establish a reasonable basis for determining damages.
 
 
 16
 On appeal, we consider the four broad issues listed above, namely: whether the evidence compels a finding that the defendants violated 1 or 2 of the Sherman Act; whether 6 of the Clayton Act and/or 1 of the Capper-Volstead Act immunizes the plaintiffs on the counterclaim, and whether Simplot or Ore-Ida is entitled to an injunction when no damages or threat of damages was proved.
 
 
 17
 * Defendants' Alleged Violation of
 
 1 of the Sherman Act
 
 18
 The basic factual issue under this claim is why the preseason contracts negotiated by the bargaining associations with Simplot, on the one hand, and Ore-Ida, on the other, contain similar price terms. The plaintiffs contend that Simplot and Ore-Ida conspired to maintain similar terms. The court, however, found that the similarities in preseason contracts stemmed from the concerted bargaining activity of the two associations and from natural market forces. Since our review of the record does not disclose clear error, we necessarily affirm this finding. Rule 52, F.R.Civ.P.
 
 
 19
 The plaintiffs adduce a variety of circumstantial evidence tending to prove the alleged conspiracy. Foremost is the similarity in contracts. In addition, the plaintiffs present documentary evidence-- memoranda, journal entries, meeting minutes, and so forth-- which show that the defendants communicated with each other, and which tend to show that they discussed prices on preseason contracts.
 
 
 20
 Because the trial court declined to infer from this circumstantial evidence that a conspiracy existed, the plaintiffs contend that the judge was laboring under the mistaken notion that a conspiracy must be proved by direct rather than circumstantial evidence. It is well-established, of course, that circumstantial evidence may suffice. Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). It is equally well-established, however, that circumstantial evidence does not compel an inference of conspiracy. In the Interstate Circuit case the Court acknowledged that powerful circumstantial evidence of conspiracy could be rebutted by direct testimony of the alleged conspirators.
 
 
 21
 It appears to us that the trial judge correctly understood the teachings of Interstate Circuit, for he stated that his findings were drawn 'from all the evidence in the case, and from the inferences that reasonably flow therefrom.'
 
 
 22
 Rebutting the circumstantial evidence of conspiracy, there was plentiful oral testimony by officers of Simplot and Ore-Ida categorically denying any sort of illicit combination or agreement in regard to preseason contracts. The trial judge found the oral rebuttal persuasive, and we, giving due regard to his opportunity to judge of the credibility of the witnesses, find no clear error.
 
 
 23
 There is other evidence tending to rebut the circumstantial evidence of a conspiracy by the defendants. For example, when the former president of Treasure Vally was asked, 'You (i.e. Treasure Valley and Malheur) were trying to achieve similar terms or identical terms from Simplot and Ore-Ida at that time; is that correct?' he responded, 'I think that's right, yes.' Thus, in addition to the defendants' denial of conspiracy, the plaintiffs' admission that the bargaining associations actively strived to obtain similar contracts supports the finding that the activity of the bargaining associations, not of Simplot and Ore-Ida, was the controlling reason for the similarity of price and contract terms.
 
 
 24
 Beyond merely asserting that the trial judge improperly disregarded circumstantial evidence, the plaintiffs maintain that he should have applied a per se rule but did not. They argue that United States v. Container Corp. of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), held that an exchange of price information by competitors that leads to price stabilization is, per se, a Sherman Act Violation.
 
 
 25
 Flaws fill this argument. First, it is far from clear that Container Corp. itself applied a per se rule rather than the rule of reason. Moreover, that case involved more than a mere exchange of price information; it involved an agreement to exchange price information whenever requested. In our case the court found that the defendants never even discussed prices at all. Whether or not that particular finding is erroneous,[4] it logically implies another finding which is not clearly erroneous-- namely, that there was no agreement to exchange information on request. Absent such an agreement, Container Corp. does not control.[5] And had there been such an agreement, even then we would not apply Container Corp., for in our case the trial court properly found that the activity of the bargaining associations was the controlling reason for the similarity of prices and contract terms. Any agreement between Simplot and Ore-Ida to exchange price data would therefore have had no substantial causal effect on preseason contracts.
 
 
 26
 Just as we find no clear error in the determination that Simplot and Ore-Ida did not conspire to fix preseason contracts, we find no clear error in two other pertinent determinations: first, that there was no agreement to allocate growers; and, second, that there was no agreement to boycott or otherwise retaliate against the officers of the bargaining associations.
 
 II
 
 27
 Defendants' Alleged Violation of 2 of the Sherman Act
 
 
 28
 The trial court ruled that Simplot and Ore-Ida did not monopolize 'any relevant market.' While our review of this determination would be aided if the relevant market or markets had been precisely defined in the record, the record as it stands will suffice to support the trial court.
 
 
 29
 'The offense of monopoly under 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.' United States v. Grinnell Corp., 384 U.S. 563, 570-571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1965). The plaintiffs have established neither of these elements.
 
 
 30
 In regard to monopoly power, we need not define the relevant market exactly, for whatever the confines may be, it appears from the record that the defendants possessed no monopoly power vis a vis the potato growers. Monopoly power is 'the power to control prices or exclude competition.' United States v. du Pont & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). The trial court found, and we believe this finding supportable, that the activity of the bargining associations, not of the defendants, was the controlling reason for the similarity of prices for raw potatoes. (Perhaps an indication of the bargaining leverage possessed by the plaintiffs is the fact that no potato growers in the country received higher prices for their raw product.) Nor did the defendants exclude competition, for there were other potato processors to whom the plaintiffs could sell, and there were also 20 fresh-potato packers as possible buyers. The plaintiffs in fact made sales to these other buyers, and made sales on the open market as well as by preseason contract. Thus, given the bargaining power of Treasure Valley and Malheur, and the availability of substitute outlets for selling raw potatoes, it can reasonably be held that Simplot and Ore-Ida lacked power sufficient to satisfy the first element required by Grinnell.
 
 
 31
 Moreover, taking the second element, the record fails to prove that the defendants indulged in 'the willful acquisition or maintenance of that power' they possessed.
 
 
 32
 The trial court likewise held that the defendants engaged in no attempt to monopolize. This offense, unlike actual monopolization, does not require the possession of monopoly power, but it does require the 'specific intent' to acquire it. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). The evidence fails to reveal specific intent.
 
 III
 
 33
 The Counterclaim: Clayton and Capper-Volstead Immunity
 
 
 34
 As to the counterclaim against the bargaining associations, the court (1) found that the activity of the bargaining associations was the controlling reason for the similarity of prices of potatoes sold to Ore-Ida and Simplot; (2) held that the two associations were immune from antitrust liability by virtue of Section 6 of the Clayton Act, 15 U.S.C. 17; and (3) found that the evidence was insufficient to establish a reasonable basis for determining damages. We hold that the district court did not err in these determinations or in refusing to award damages or grant an injunction against the bargaining associations.
 
 
 35
 Ore-Ida and Simplot (cross-appellants) state that 'they do not question this factual ruling on damages.' But, although they do not seek damages, they do seek an injunction against the two associations, and contend that the associations, by acting together on prices, have no immunity under Section 6 of the Clayton Act, 15 U.S.C. 17.
 
 
 36
 There is little law on the question of the extent of the Section 6 immunity. United States v. Borden, 308 U.S. 188, 204-205, 60 S.Ct. 182, 84 L.Ed. 181 (1939), stands for the proposition that an agricultural cooperative loses its exemptions under the Capper-Volstead Act, 7 U.S.C. 291, 292, if it enters into agreements with 'other persons' who in that case were non-producers of milk.
 
 
 37
 In United States v. Maryland Cooperative Milk Producers (D.C.D.C.1956), 145 F.Supp. 151, Judge Holtzoff ruled in a criminal case that price fixing between two separate agricultural cooperatives was immunized by Section 6 of the Clayton Act and acquitted the defendants. The fact that the government had no right to appeal from the acquittal detracts from the weight to be attached to the decision.
 
 
 38
 Two years later came the case of United States v. Maryland and Virginia Producers Ass'n (D.C.D.C.1958), 167 F.Supp. 45, rev'd, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960), a civil antitrust action. Judge Holtzoff repeated his statement that an agricultural cooperative is exempt from the antitrust laws in its activities, provided it does not conspire with other persons who are not producers of agricultural products. But in this case the cooperative had purchased all the assets of a competitor, the Embassy Dairy, which was not an agricultural producer.
 
 
 39
 The complaint charged that the milk producers association (1) had attempted to monopolize and had monopolized interstate trade and commerce in fluid milk in Maryland, Virginia and the District of Columbia in violation of Section 2 of the Sherman Act; (2) had combined and conspired with Embassy Dairy and others, through contracts and agreements, to eliminate and foreclose competition in the same market in violation of Section 3 of the Act; and (3) had bought all the assets of Embassy Dairy, the largest competitor, the effect of which might have been substantially to lessen competition or to tend to create a monopoly in violation of Section 7 of the Clayton Act.
 
 
 40
 The district court dismissed the Sherman Act, Section 2, monopolization charge. It upheld the right of the government to go to trial on the Sherman Act, Section 3, and Clayton Act, Section 7, charges. After trial on these charges the district court found for the United States and entered a decree ordering the association to divest itself of all assets acquired from Embassy Dairy.
 
 
 41
 The case reached the Supreme Court in Maryland and Virginia Milk Producers' Ass'n, Inc. v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960). The Court affirmed the portion of the judgment concerning Section 3 of the Sherman Act and Section 7 of the Clayton Act, relying on United States v. Borden, 308 U.S. 188, 206, 60 S.Ct. 182, 84 L.Ed. 181 (1939). The acquisition of the Embassy Dairy thus caused the association to lose any immunity it might have under Section 6 of the Clayton Act, 15 U.S.C. 17, or Section 1 of the Capper-Volstead Act, 7 U.S.C. 291.
 
 
 42
 As to the monopolization charge under the Sherman Act, Section 2, the Supreme Court reversed the dismissal entered by the district court.[6] The Court stated (p. 468, 80 S.Ct. p. 854):
 
 
 43
 Sherman Act 2 Dismissal.-- The complaint charging monopolization alleged that the Association had 'threatened and undertaken diverse actions to induce or compel dealers to purchase milk from the defendant (Association), and induced and assisted others to acquire dealer outlets' which were not purchasing milk from the Association. It also alleged that the Association 'excluded, eliminated and attempted to eliminate others, including producers and producers' agricultural cooperative associations not affiliated with defendant, from supplying milk to dealers.' Supporting this charge the statement of particulars listed a number of instances in which the Association attempted to interfere with truck shipments of nonmembers' milk, and an attempt during 1939-1942 to induce a Washington dairy to switch its non-Association producers to the Baltimore market. The statement of particulars also included charges that the Association engaged in a boycott of a feed and farm supply store to compel its owner, who also owned an Alexandria dairy, to purchase milk from the Association, and that it compelled a dairy to buy its milk by using the leverage of that dairy's indebtedness to the Association. We are satisfied that the allegations of the complaint and the statement of particulars, only a part of which we have set out, charge anticompetitive activities which are so far outside the 'legitimate objects' of a cooperative that, if proved, they would constitute clear violations of 2 of the Sherman Act by this Association, a fact, indeed, which the Association does not really dispute if it is subject to liability under this section. It was error for the District Court to dismiss the 2 charge.[7]
 
 
 44
 The acts listed were clearly 'predatory' and outside the legitimate objects of the cooperative, id., p. 468, 80 S.Ct. 847, in obtaining a fair price for its member milk producers. They are a far cry from the acts of the two potato associations in our case to obtain the same price for members of both associations, as found by the district court.
 
 
 45
 In 1962 the Supreme Court decided Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305. We note the following as to cooperatives there involved:
 
 
 46
 (1) Sunkist Growers, Inc. 12,000 growers were organized into local associations; the associations in turn were organized into district exchanges; and the representatives of the exchanges made up the governing board of Sunkist. (p. 21, 82 S.Ct. 1130)
 
 
 47
 (2) Exchange Orange was a separate legal entity composed of orange grower associations. In 1931 it was purchased by Sunkist and thereafter operated as a wholly-owned subsidiary of Sunkist. (p. 20, 82 S.Ct. 1130)
 
 
 48
 (3) Exchange Lemon was a separate legal entity composed of lemon grower associations, which were also members of Sunkist. (p. 21, 82 S.Ct. 1130)
 
 
 49
 (4) The fruit, both oranges and lemons, was marketed and priced by Sunkist. (p. 22, 82 S.Ct. 1130)
 
 
 50
 The defendants, Sunkist and Exchange Orange (Exchange Lemon was not a defendant), were held by the district court to be in violation of the antitrust laws. Certiorari was granted on the petition of Sunkist and Exchange Orange and the judgment below was reversed because the instructions, according to the Supreme Court, 'left it open for the jury to base their verdict upon a finding of conspiracy between petitioners (Sunkist and Exchange Orange) and Exchange Lemon. The Court stated: (pp. 27-29, 82 S.Ct. pp. 1135-1136):
 
 
 51
 We are squarely presented, then, with the question of whether Sunkist, Exchange Orange, and Exchange Lemon-- the three legal entities formed by these 12,000 growers-- can be considered independent parties for the purposes of the conspiracy provisions of 1 and 2 of the Sherman Act. We conclude not. Section 6 of the Clayton Act provides, inter alia, that agricultural organizations instituted for the purposes of mutual help shall not be held or construed to be illegal combinations or conspiracies in restraint of trade under the antitrust laws. The Capper-Volstead Act sets out this immunity in greater specificity:
 
 
 52
 'That persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes . . ..'There can be no doubt that under these statutes the 12,000 California-Arizona citrus growers ultimately involved could join together into one organization for the collective processing and marketing of their fruit and fruit products without the business decisions of their officers being held combinations or conspiracies. The language of the Capper-Volstead Act is specific in permitting concerted efforts by farmers in the processing, preparing for market, and marketing of their products . . ..
 
 
 53
 Instead of a single cooperative, these growers through local associations first formed one area-wide organization (Sunkist) for marketing purposes . . .. With due respect to the contrary opinions of the Court of Appeals and District Court, we feel that the 12,000 growers here involved are in practical effect and in the contemplation of the statutes one 'organization' or 'association' even though they have formally organized themselves into three separate legal entities. To hold otherwise would be to impose grave legal consequences upon organizational distinctions that are of de minimis meaning and effect to these growers who have banded together for processing and marketing purposes within the purview of the Clayton and Capper-Volstead Acts.
 
 
 54
 Only one reference was made to the Maryland case (362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880). It appears in the concluding paragraph of the opinion.
 
 
 55
 Suffice it to say that our decision in no way detracts from earlier cases holding agricultural cooperatives liable for conspiracies with outside groups, United States v. Borden Co. 308 U.S. 188 (60 S.Ct. 182, 84 L.Ed. 181) (1939), and for, monopolization, Maryland & Virginia Milk Producers Ass'n. v. United States, 362 U.S. 458 (80 S.Ct. 847, 4 L.Ed.2d 880) (1960). (p. 30, 82 S.Ct. p. 1136)
 
 
 56
 We infer that the Supreme Court in Sunkist found the defendants had not engaged in 'predatory practices' or 'monopolization' as those terms were used in the Maryland opinion, and thus the price practices of Sunkist, Exchange Orange and Exchange Lemon were not within the scope of Maryland's holding. See United Egg Producers v. Bauer International Corp. (S.D.N.Y.1970), 312 F.Supp. 319, where the court, relying on Sunkist, supra, held that cooperatives are 'immune from the proscriptions of Section 1 of the Sherman Act . . ..'
 
 
 57
 In our case we consider both Section 6 of the Clayton Act, 15 U.S.C. 17, and Section 1 of the Capper-Volstead Act of 1922, 42 Stat. 388, 7 U.S.C. 291.
 
 
 58
 Section 1 of the Capper-Volstead Act provides:
 
 
 59
 'Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes . . ..'
 
 
 60
 All authorities agree that one impact of the Capper-Volstead Act was to permit agricultural cooperatives exempt under the Clayton Act to issue capital stock. The Supreme Court in Case-Swayne Company, Inc. v. Sunkist Growers, Inc., 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967) states (at 391, 88 S.Ct. 528) that the Capper-Volstead Act was enacted to clarify the exemption for agricultural cooperatives and to extend it to cooperatives having capital stock. Accord, Maryland and Virginia Milk Producers Association, Inc. v. United States, 362 U.S. 458, 468, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960); United States v. Maryland & Virginia Milk Producers Ass'n (D.C.D.C.1958), 167 F.Supp. 45, 50; modified on other grounds, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960).
 
 
 61
 An additional contribution of the Capper-Volstead Act is the express language: 'Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes.' There is no way to read the section but to accept the express language that two or more associations may 'have marketing agencies in common.' The only uncertainty is what activities such marketing agencies may practice.
 
 
 62
 The particular provision has been interpreted expressly in only one case, United States v. Maryland Cooperative Milk Producers, Inc. (D.C.D.C.1956), 145 F.Supp. 151, 155. That case accepts the express language of the section as we do. The court stated: 'It will be noted that the Act permits agricultural cooperatives to have marketing agencies in common. Obviously, it must have been contemplated that a common marketing agency would fix the same prices for the products of all its principals and would not discriminate among them.' (p. 154)
 
 
 63
 In Farmers' Live Stock Commission Co. v. United States (E.D.Ill.1931), 54 F.2d 375, 377, the court in discussing a common agent employed by eight associations, said: 'Such an agency, owned by co-operative associations in common, is authorized by the Capper-Volstead Act . . ..' See also 'A Prediction: The Exemption Favoring Agricultural Cooperatives Will Be Reaffirmed' by Seth M. Hufstedler, Vol. 22, Administrative Law Review (1969-1970), 455, 463.
 
 
 64
 If Section 1 of the Capper-Volstead Act, 7 U.S.C. 291, permits a common marketing agency, separate from the cooperatives themselves, it would follow that without such a separate agency, the associations may act together in marketing and make the necessary contracts to accomplish their legitimate purpose. If an act of the agent is lawful, the same act performed by the principal is also lawful.
 
 
 65
 The Cooperative Marketing Act of 1926, 44 Stat. 803, 7 U.S.C. 455,[8] lends support to this interpretation. Section 455 provides:
 
 
 66
 'Dissemination of crop, market, etc., information by cooperative marketing associations Persons engaged, as original producers of agricultural products, such as farmers, planters, ranchmen, dairymen, nut or fruit growers, acting together in associations, corporate or otherwise, in collectively processing, preparing for market, handling and marketing in interstate and/or foreign commerce such products of persons so engaged, may acquire, exchange, interpret, and disseminate past, present, and prospective crop, market, statistical, economic, and other similar information by direct exchange between such persons, and/or such associations or federations thereof, and/or by and through a common agent created or selected by them.' (July 2, 1926, c. 725, 5, 44 Stat. 803.)
 
 
 67
 The defendants (cross-appellants) assert, however, that the Capper-Volstead Act is inapplicable to the potato growers associations in this case. The defendants here make the flat statement: 'Since neither Malheur Ass'n nor Treasure Valley Ass'n engage in the sale of potatoes, they do not qualify as an exempt organization because they engage in none of the functions enumerated in the statute.' This statement begs the question-- must associations engage in the sale of potatoes in order to be considered as engaged in 'marketing'?
 
 
 68
 The two associations were in fact 'bargaining' associations. They were named 'Malheur Potato Bargaining Association' and 'Treasure Valley Potato Bargaining Association.' Their principal function was to bargain collectively for their respective members as to prices, terms and conditions of preseason potato contracts. They 'coordinated their bargaining efforts' and tacitly attempted to secure similar contracts from both associations so that their members would be treated similarly regardless of the defendant-processor to whom they sold their potatoes.[9]
 
 
 69
 True, the associations did not collectively process, prepare for market, handle or actually sell potatoes. But Section 1 of the Capper-Volstead Act further authorizes 'Persons engaged in the production of agricultural products as farmers . . . (to) act together in associations . . . in collectively . . . marketing in interstate and foreign commerce, such products of persons so engaged . . . may have marketing agencies in common; . . ..'
 
 
 70
 The activities of the two associations came within the word marketing. Each association acted and bargained for its members in negotiating contracts for the sale of potatoes by its members. It was such bargaining activity, and particularly the practice of one association following the lead of the other, and attempting to secure for its members the same price obtained by the other association in its first contract with Ore-Ida and Simplot, that was the basis for defendants' (cross-appellants') contention of antitrust violations.
 
 
 71
 We think the term marketing is far broader than the word sell. A common definition of 'marketing' is this: 'The aggregate of functions involved in transferring title and in moving goods from producer to consumer, including among others buying, selling, storing, transporting, standardizing, financing, risk bearing, and supplying market information.' Webster's New Collegiate Dictionary, 1953 Edition. The associations here were engaged in bargaining for the sales to be made by their individual members. This necessarily requires supplying market information and performing other acts that are part of the aggregate of functions involved in the transferring of title to the potatoes. The associations were thus clearly performing 'marketing' functions within the plain meaning of the term. We see no reason to give that word a special meaning within the context of the Capper-Volstead Act.
 
 
 72
 L. Gene Lemon, Assistant General counsel for the American Farm Bureau Federation in 'The Capper-Volstead Act-- Will it Ever Grow Up', Vol. 22, Admin.Law Review, pp. 433, 447, et seq., distinguishes between 'Handling cooperatives' and 'Bargaining Cooperatives.' There is no indication that he does not consider them as exempt under the Clayton and Capper-Volstead Acts, or that 'bargaining' is not an exempt activity for an agricultural cooperative. He concludes 'that bargaining cooperatives are much in need of somewhat more liberal court constructions of the Capper-Volstead Act, perhaps more so than are handling cooperatives.' (p. 450-451.)[10]
 
 
 73
 Without doubt, an agricultural cooperative is not wholly exempt under Sec. 6 of the Clayton Act or Section 1 of the Capper-Volstead Act from the scope of the antitrust laws. A cooperative can lose its exemption if it monopolizes, or attempts to monopolize, or engages in 'predatory practices.' Maryland and Virginia Milk Producers Ass'n, Inc. v. United States, supra (362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880). It can lose its exemption by entering into agreements or conspiring as to prices with 'other persons' who are non-producers. United States v. Borden, supra.[11]
 
 
 74
 Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., supra, reversed a judgment because the Court's instructions left it open for the jury to base its verdict on a finding of conspiracy between Sunkist and Exchange Orange (the petitioners) and Exchange Lemon, a separate legal entity. True, the Court stated that in effect they were one organization and thus exempt. But the Court also stated (370 U.S. p. 29, 82 S.Ct. p. 1136), 'To hold otherwise would be to impose grave legal consequences upon organizational distinctions that are of de minimis meaning and effect to these growers who have banded together for processing and marketing purposes . . ..'
 
 
 75
 In our case, to the extent that the grower associations have banded together for marketing purposes, their organizational distinctions are de minimus.
 
 
 76
 Moreover, there was no finding of monopolization or attempt to monopolize by the associations; nor of any 'predatory practices' such as existed in the Maryland case. Neither Ore-Ida nor Simplot so contend on this appeal. Nor did either plaintiff association in its activities compete with or injure other sellers of potatoes. The activities of the associations were directed toward securing a fair price for their grower members and their only alleged 'sin' was agreeing that the price obtained by one association would be the price carried over into the other association's contract.
 
 
 77
 We hold that the trial court did not err in refusing to hold them in violation of the antitrust laws.
 
 IV
 The Counterclaim: Absence of Injury
 
 78
 In any event, the district court held that 'the proffered evidence of (Ore-Ida and Simplot) as to measure of damages was based on conjecture and speculation and insufficient to establish a reasonable basis for determining damages.' Ore-Ida and Simplot do not challenge this factual finding, nor do we see any error. Therefore, even absent the Clayton Act immunity, Ore-Ida and Simplot were not entitled to damages; further-more, they were not entitled to an injunction under traditional principles of equity.
 
 
 79
 Section 16 of the Clayton Act, 15 U.S.C. 26, provides as follows: 'Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . . ..'
 
 
 80
 A traditional principle of equity is that no injunction will issue unless the allegedly unlawful conduct is likely to cause irreparable harm. Nowhere has the district court found a threat of irreparable injury. On the other hand, there is no explicit finding that no such threat exists. But we are not troubled by the lack of an explicit finding on this point, for we believe that the abovequoted language of the district court fairly implies, in the context of the entire record, a finding that no threat of irreparable injury existed.
 
 
 81
 The court's language, of course, refers only to the measure of damages alleged to have occurred in the past. It does not state that no injury was likely to occur in the future.
 
 
 82
 Although the explicit meaning of this statement is limited, a great deal more is implicit in the words 'conjecture and speculation.' These words, when read in the context of the entire lengthy findings of fact and conclusions of law, and all the evidence on record, suggest to us that the district court believed not only the measure of past damages to be speculative and conjectural, but the very existence of past injury to be equally uncertain. And the record as a whole suggests further that the court believed that the existence of a threatened future injury was likewise dubious.
 
 
 83
 It is true, of course, that injury sometimes occurs whose measure is uncertain, and a threat of injury may be quite real even though the measure of the threatened injury defies calculation. And if the threat is real, an injunction may issue even though the injury, if it were to occur, could be measured only by speculation and conjecture. Indeed, one reason for issuing an injunction may be that damages, being immeasurable, will not provide a remedy at law.
 
 
 84
 But such is not our case. Here, we feel, the district court implied that the very existence of a threat was based on conjecture and speculation, and our review of the record uncovers no evidence sufficient to support a finding that a threat did exist. Under these circumstances no injunction can issue.
 
 
 85
 The judgments in the main action and on the counterclaim are affirmed.
 
 
 
 [1]
 A preseason contract is an agreement made between a grower and a processor in the spring, when the potatoes are planted. The grower agrees to raise and harvest potatoes on specifed land, and the processor agrees to buy the crop at a certain price (which is modified by formula according to the size, quality, and condition of the raw potatoes at delivery). The grower is therefore assured in advance that he can sell his potatoes at a fairly predictable price, and the processor is assured he can fill his future requirements
 Thus preseason contracts eliminate some of the risk of the open market. On the open market, where raw potatoes are sold after the harvest, prices rise and fall from day to day, and the vagaries of weather, crop disease, and consumer appetite are constantly altering the best laid plans. Yet, with all the uncertainties attending the open market, a significant portion of each potato crop is sold only after the harvest, rather than in spring by preseason contract.
 
 
 [2]
 Originally the two associations were plaintiffs in the action. The court dismissed as to them for lack of capacity to sue, since they did not sell potatoes. No appeal was taken from their dismissal. They remained as cross-defendants on the counterclaim
 
 
 [3]
 Before trial, the district judge granted summary judgment for the defendants on three of plaintiffs' claims: (1) that Simplot and Ore-Ida discriminated against growers who refused to purchase seed or fertilizer from them; (2) that Simplot and Ore-Ida fixed artificially high prices at which they would sell their frozen french fries in the aftermarket; and (3) that Simplot and Ore-Ida acquired land, and grew potatoes on it, for the purpose of driving independent growers out of business. The defendants' motion for summary judgment was granted on the plaintiffs' stipulation that no pecuniary damages were being sought on those claims. Plaintiffs do not assign error to the summary judgment
 At trial, plaintiffs dropped the boycott charges as to the officers of Malheur Ass'n and as to 11 of the 15 officers of Treasure Valley Ass'n.
 
 
 [4]
 The plaintiffs contend that this finding is clearly erroneous, and we, too, believe that it may be wrong, for the record presents fairly clear evidence that some price discussions in fact occurred. Nevertheless, it is not necessary to determine whether or not the finding was correct, for even if it was wrong, the error did not control the outcome of the case
 
 
 [5]
 Gray v. Shell Oil Company (9 Cir. 1972) 469 F.2d 742, 746; cert. denied, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973)
 
 
 [6]
 The dismissal by the district court may have been based on the fact that the Embassy Dairy acquisition had apparently not been charged as a part of the monopolization violation. See 362 U.S. 466, 80 S.Ct. 847, and the case below, United States v. Maryland and Virginia Milk Producers Ass'n, Inc. (D.C.D.C.1958), 167 F.Supp. 45, 47
 
 
 [7]
 Elsewhere the Court stated:
 This Court has held that the provisions of that section (Clayton Act 6) relating to labor unions do not manifest 'a congressional purpose wholly to exempt' them from the antitrust laws, and neither the language nor the legislative history of the section indicates a congressional purpose to grant any broader immunity to agricultural cooperatives . . .. Thus the full effect of 6 is that a group of farmers acting together as a single entity in an association cannot be restrained 'from lawfully carrying out the legitimate objects thereof', but the section cannot support the contention that it gives such an entity full freedom to engage in predatory trade practices at will. See United States v. King, (1 Cir.) 229 F. 275, D.C., 250 F. 908, 910. Cf. United States v. Borden Co., 308 U.S. 188, 203-205 (60 S.Ct. 182, 190-191, 84 L.Ed. 181).
 The Capper-Volstead Act of 1922 extended 6 of the Clayton Act exemption to capital stock agricultural cooperatives which had not previously been covered by that section. Section 1 of the Capper-Volstead Act also provided that among 'the legitimate objects' of farmer organizations were 'collectively processing, preparing for market, handling, and marketing' products through common marketing agencies and the making of 'necessary contracts and agreements to effect such purposes.' We believe it reasonably clear from the very language of the Capper-Volstead Act, as it was in 6 of the Clayton Act, that the general philosophy of both was simply that individual farmers should be given, through agricultural cooperatives acting as entities, the same unified competitive advantage-- and responsibility-- available to businessmen acting through corporations as entities. As the House Report on the Capper-Volstead Act said:
 'Instead of granting a class privilege, it aims to equalize existing privileges by changing the law applicable to the ordinary business corporations so the farmers can take advantage of it.' This indicates a purpose to make it possible for farmer-producers to organize together, set association policy, fix prices at which their cooperative will sell their produce, and otherwise carry on like a business corporation without thereby violating the antitrust laws. It does not suggest a congressional desire to vest cooperatives with unrestricted power to restrain trade or to achieve monopoly by preying on independent producers, processors or dealers intent on carrying on their own businesses in their own legitimate way . . .. Although contrary inferences could be drawn from some parts of the legislative history, we are satisfied . . . that the Act did not leave cooperatives free to engage in practices against other persons in order to monopolize trade, or restrain and suppress competition with the cooperative. (pp. 464-467, 80 S.Ct. p. 852)
 
 
 [8]
 The only references we can find to this section in case law are United States v. Maryland Cooperative Milk Producers, Inc., supra (145 F.Supp. 151, 155) and United States v. Borden Co. (D.C.Ill.1939), 28 F.Supp. 177, 184
 
 
 [9]
 The court found, 'By tacit agreement between the two Associations, they sought to obtain similar terms and provisions in the preseason contracts of the respective processor upon which they had tacitly agreed.' Malheur bargained first with Ore-Ida and when agreement was reached between them as to price and terms, Treasure Valley would adopt essentially the same form of contract of its members selling potatoes to Ore-Ida. Similarly, contracts negotiated beween Treasure Valley and Simplot were thereupon approved by Malheur for its members selling potatoes to Simplot. Normally there were no negotiations, as such, between Malheur and Simplot or between Treasure Valley and Ore-Ida. Since some members of each association sold potatoes to both Ore-Ida and Simplot, it was the avowed goal of the two associations and their members to obtain similar contracts from both defendants, so that their members would be treated similarly regardless of the processor to whom they sold their potatoes
 The court further found that the two associations, their officers, directors and bargaining committees met frequently, exchanged information on the progress of each other's negotiations and 'coordinated their bargaining efforts.'
 The court further found:
 'No activity of either association, separately or together, was predatory or undertaken for any purpose other than the legitimate promotion of grower interests in accordance with Sec. 6 of the Clayton Act.'
 
 
 [10]
 The best discussion we have been able to find on the Clayton and the Capper-Volstead Acts was a panel discussion of the Administrative Law Section of the American Bar Association at the 1969 annual meeting of the Section in Dallas, Texas. It was sponsored by the Agricultural Committee of the Section under the chairmanship of Stuart H. Russell. Three presentations were made:
 (1) 'Cooperative Exemptions under the Antitrust Laws: A prosecutor's View' by Charles D. Mahaffie, Chief, General Litigation Section, Antitrust Division, Dept. of Justice; (2) 'The Capper-Volstead Act-- Will it Ever Grow Up' by L. Gene Lemon, member of the Illinois Bar, Assistant General Counsel of the American Farm Bureau Federation, and (3) 'A Prediction: The Exemption Favoring Agricultural Cooperatives Will Be Reaffirmed' by Seth M. Hufstedler, member of the California Bar and then President of the Los Angeles County Bar Association.
 
 
 [11]
 A portion of the remarks of Seth M. Hufstedler at the Administrative Law Section of the American Bar Association in Dallas (footnote 9) are here set forth:
 We can summarize then the things the Courts have said that a Capper-Volstead cooperative can do.
 
 
 [1]
 Producers may organize together in a single entity
 
 
 [2]
 The entity may set Association policy
 
 
 [3]
 The entity may fix prices
 
 
 [4]
 The entity may obtain a complete monopoly, 100% Of the product involved
 
 
 [5]
 The Association may handle all of the production of its members
 
 
 [6]
 It may process all of the products of its members
 
 
 [7]
 It may prepare the products for market
 
 
 [8]
 It may market the products
 
 
 [9]
 The producers and the Associations may have marketing agencies in common
 
 
 [10]
 The producers and the Associations may make the necessary contracts to carry out the legitimate objects of the producers and their Associations
 The Supreme Court has also laid down guide lines on what such an Association cannot do. Maryland and Virginia pointed out that the Association could not engage in 'predatory trade practices.' In Winckler, it was made clear that the Association cannot engage in 'competition stifling practices,' and the Association may not engage in 'monopolization.' In Maryland and Virginia, the Court said that the cooperatives could not 'restrain trade', or 'achieve monopoly by preying on independent producers, processors or dealers intent on carrying on their own businesses in their own legitimate way.'
 Various courts have determined that certain conduct constitutes 'predatory trade practices.'
 In Maryland and Virginia, the following conduct was involved.
 
 
 [1]
 The cooperative interfered with shipments of nonmembers milk
 
 
 [2]
 It induced one dairy to switch its marketing outlets from the area of direct competition with the cooperative
 
 
 [3]
 Its members boycotted a business to compel it to deal with the cooperative
 
 
 [4]
 The cooperative used its economic power through loans to compel dealings with the cooperative
 
 
 [5]
 The cooperative bought out its competitor at an exorbitant price to eliminate competition
 In Bergjans (Bergjans Farm Dairy Co. v. Sanitary Milk Producers (E.D.Mo.1965), 241 F.Supp. 476), the following conduct was discussed:
 
 
 [1]
 Attempts by the cooperative to compel customers to deal on an exclusive basis with the cooperative
 
 
 [2]
 Illegal rebates were given
 
 
 [3]
 The cooperative engaged in 'manipulation to control the market.'
 
 
 [4]
 The cooperative conspired with retail outlets to fix resale prices
 
 
 [5]
 The Court found that there was an express intent to use unlawful means to control the market
 On top of all this, said the Court, the officers of the cooperative lied in their testimony. One does not have much difficulty characterizing such conduct as 'predatory trade practices.'
 In the North Texas case, the following conduct was involved:
 
 
 [1]
 The cooperative compelled customers to deal exclusively with it
 
 
 [2]
 There were apparently tying conditions involving the use of trucking
 
 
 [3]
 The cooperative instituted a boycott to accomplish its market control. (North Texas Producers Ass'n v. Metzger Dairies, Inc., 348 F.2d 189 (5th Cir. 1965)
 In the Borden case, of course, the conduct complained of was the conspiracy with nonqualified persons to fix prices. (United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939)).
 In the Otto Milk case, the conduct complained of was compelling shop keepers not to buy from others through a conspiracy and boycott. (Otto Milk Co. v. United Dairy Farmers Coop. Ass'n, 388 F.2d 789 (3rd Cir. 1967)).
 An examination of the kind of conduct which has thus been condemned shows that it would be difficult under any circumstances to justify the activities which the Court found took place. However strictly 'predatory trade practices' may be defined, this conduct clearly constitutes such illegal practice. (Vol. 22, Admin.Law Review (1969-70) 455 at 461-463.)