SUNKIST GROWERS, INC., ET AL. v. WINCKLER &
SMITH CITRUS PRODUCTS CO. ET AL.

No. 241.  Argued March 21–22, 1962.—Decided May 28, 1962.

20

*Herman F. Selvin* argued the cause for petitioners. With him on the briefs was *Ross C. Fisher*.

*William C. Dixon* argued the cause for respondents. With him on the briefs was *Holmes Baldridge*.

MR. JUSTICE CLARK delivered the opinion of the Court.

This is a treble damage suit brought under § 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15, charging petitioners, Sunkist Growers, Incorporated, and The Exchange Orange Products Company, with conspiracy to restrain and monopolize interstate trade and commerce in citrus fruits and by-products and with actual monopolization thereof in violation of §§ 1 and 2 of the Sherman Act, 26 Stat. 209, 15 U. S. C. §§ 1, 2, as amended. The petitioners are each agricultural cooperative organizations, Exchange Orange being a wholly owned subsidiary of Sunkist. Petitioners contend the case was submitted under instructions permitting the jury to find an illegal conspiracy among them and Exchange Lemon Products Company, a cooperative processing association owned and operated exclusively by a number of lemon-grower associations all of which are members of Sunkist Growers, Inc. They say that under the exemptions from the antitrust laws granted agricultural associations by § 6 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 17, and § 1 of the Capper-Volstead Act, 42 Stat. 388, 7 U. S. C. § 291, Sunkist, Exchange Orange, and Exchange Lemon, being made up of the same growers and associations, cannot be charged with conspiracy among themselves. The trial court overruled this contention, among others, and the jury returned a verdict of $500,000. Judgment for treble this amount and attorney fees, less some minor offsets, was entered. The Court of Appeals, accepting petitioners' view of the instructions, held that the exemption claimed did not apply here and affirmed the judgment as to liability but

reversed as to the amount of damages. 284 F. 2d 1. We granted certiorari limited to the issue of the immunity of interorganizational dealings among the three cooperatives from the conspiracy provisions of the antitrust laws. 368 U. S. 813. We have concluded that the case was submitted to the jury on the theory claimed by petitioners and that this was erroneous. Thus we reverse the judgment.

Sunkist Growers, Inc., has at its base 12,000 growers of citrus fruits in California and Arizona. These growers are organized into local associations which operate packing houses. The associations in turn are grouped into district exchanges, and representatives from these exchanges make up the governing board of Sunkist, a nonstock membership corporation. Sunkist serves the members as an organization for marketing their fresh fruit and fruit products [1] through its field, advertising, sales, and traffic departments. All of its net revenues are distributed to the members.

In 1915 several member associations of Sunkist undertook to develop by-products for lemons in order to create a market for produce not salable as fresh fruit. Because this was a new, untried field the entire cooperative did not participate. Rather a separate cooperative—Exchange Lemon, a nonprofit stock corporation—was formed for this venture by the interested associations. Since that time Exchange Lemon has retained its separate identity although it is made up exclusively of lemon-grower associations which are also members of Sunkist. Its function now is primarily one of processing, and the resultant products are marketed for the owners by Sunkist through its products department, which is jointly managed by directors of Exchange Lemon and Exchange Orange.

---

[1] These include juices, concentrates, oil, pectin, pharmaceuticals, and cattle feed.

One year after the organization of Exchange Lemon a similar association was formed to develop by-products for oranges. This organization, Exchange Orange, was comprised of a number of Sunkist member associations until 1931. At that time the Sunkist directors decided to make the processing facilities of Exchange Orange available to all of its member associations by purchasing it and operating it as a wholly owned subsidiary.

In sum, the individual growers involved each belong to a local grower association. Fruit which is to be sold fresh is packed by the associations and marketed by Sunkist, a nonstock membership corporation comprised of district exchanges to which the associations belong. Most fruit which is to be processed into by-products is handled by Exchange Orange, a subsidiary of Sunkist, or by Exchange Lemon, a separate organization comprised of a number of Sunkist member associations.[2] It is then marketed by the products department of Sunkist which is managed by directors of Exchange Orange and Exchange Lemon.

Competing with the three cooperatives in the California-Arizona area in the business of processing and selling canned orange juice were four independent processors, which were primarily dependent upon Sunkist for their supply of by-product oranges.[3] In 1951 two of these concerns, TreeSweet Products Company and E. A. Silzle Corporation, had process-and-purchase contracts with Exchange Orange. Under its contract TreeSweet agreed to process at cost an undetermined amount of oranges provided by Exchange Orange and to purchase the resultant orange juice at the then current price of Sunkist. The average net price for the oranges under this contract was

---

[2] Some by-product fruit is sold to or processed by independent processors.

[3] Sunkist also sold by-product oranges to additional companies for processing into by-products other than canned orange juice.

alleged to have been $25.10 per ton.[4]   The contract with Silzle provided that it would process a stated amount of oranges for Exchange Orange and purchase the juice at a stated price less its processing cost alleged to have netted $17.66 per ton.[5]   The third producer, Case-Swayne Company, allegedly declined Sunkist's offer of a similar contract.   Respondent Winckler & Smith Citrus Products Company, the final processor, was offered oranges only at the list price of $40 to $44 per ton, depending upon content of soluble solids, and was refused the process-and-purchase arrangements described above.

Respondents brought this suit on the theory that Sunkist and Exchange Orange controlled the supply of by-product oranges available in the California-Arizona area to independent processors; that they combined and conspired with Exchange Lemon, TreeSweet, and Silzle to restrain and to monopolize interstate trade and commerce in 1951 in the processing and sale of citrus fruit juices, particularly canned orange juice; that they in fact monopolized such trade and commerce; and that the purpose or effect thereof was the elimination of Winckler as a competitor in the sale of such juices.   Respondents relied on six specific acts and contracts which allegedly furthered the conspiracy, namely: (1) the processing of oranges at cost by Exchange Lemon for Exchange Orange during 1951; (2) the processing of lemons at cost by Exchange Orange for Exchange Lemon during 1951; (3) the establishment by Sunkist and Exchange Orange of a price to independent processors alleged to be too high to enable purchasers to compete, i. e., the $40-$44 per ton list price; (4) the contract between Exchange Orange and TreeSweet in 1951; (5) the contract between Ex-

---

[4] The soluble solids content of the oranges processed by TreeSweet under this contract averaged 131.6 pounds per ton.

[5] The soluble solids content of these oranges averaged 120 pounds per ton.

24

change Orange and Silzle in 1951; (6) the refusal to sign a comparable contract with respondent Winckler.

After a lengthy trial producing a 4,000-page transcript, the case went to the jury under a necessarily complicated charge. As to the parties the jury might find to have participated in an illegal conspiracy, the court gave several instructions. One, given early in the charge, was that:

> "a parent corporation and its wholly-owned subsidiary can be guilty of combining or conspiring together to violate the antitrust laws. The defendants Sunkist Growers, Inc., and its wholly-owned subsidiary Exchange Orange Products Company, can accordingly combine or conspire together or with others to violate Sections 1 and 2 of the Sherman Act as charged in the first and second causes of action, subject to other instructions concerning the Capper-Volstead Act, and Section 6 of the Clayton Act, and the exemptions contained therein."

The instructions on the Clayton and Capper-Volstead Acts merely stated that the cooperatives could lawfully have a monopoly of the fruit and products in which they dealt. Later references to the alleged conspiracy often mentioned only petitioners and the two independent processors, e. g., "If you find that either or both of the defendants [Sunkist and Exchange Orange, petitioners here] combined with TreeSweet or Silzle to eliminate the competition of the plaintiff . . . ." However, the court's concluding instructions on the subject could well have been taken by the jury as permitting them to find an illegal conspiracy solely among the three cooperatives:

> "Unless you find, therefore, from the preponderance of the evidence, that Sunkist or Exchange Orange or either of them, combined or conspired with either TreeSweet, or Silzle, or ELP [Exchange Lemon Prod-

ucts], and in 1951 did one or more of the specific acts charged . . . .

". . . Unless you find from the preponderance of the evidence that defendants Sunkist and Exchange Orange, or either of them, and one or more of the alleged co-conspirators [one of which was Exchange Lemon], combined and conspired, and pursuant to such combination or conspiracy . . . .

"Those are summary instructions which sort of sum up what is charged and what the plaintiff must prove."

And in a final addendum after consultation with counsel the court instructed that:

"I also am told that I spoke about how the defendants had conspired on one occasion. The charge is not that the defendants conspired. The charge is that the defendants and co-conspirators conspired.

"However, as a matter of fact, you may find that nobody conspired, or you may pick out and decide that some number less than the total conspired."

On the question now before us, the Court of Appeals held that any objection to at least one of the conspiracy instructions was waived; that in any event different agricultural cooperatives combining together are not entitled to claim a total immunity for acts which they might do unilaterally and individually; and that the common ownership of Sunkist, Exchange Orange, and Exchange Lemon did not prevent the finding of an illegal conspiracy among them.

We believe the instructions quite plainly left it open for the jury to base their verdict upon a finding of a conspiracy among petitioners and Exchange Lemon.[6]    At the outset

---

[6] It could be argued that the instructions also permitted the jury to find an illegal conspiracy solely between petitioners. Our holding renders unnecessary an evaluation of this interpretation of the charge.

the court instructed that a conspiracy could be found between Sunkist and its wholly owned subsidiary Exchange Orange. Thereafter the charge advised the jury that a finding of conspiracy between "Sunkist or Exchange Orange or either of them . . . [and] either TreeSweet, or Silzle, or ELP" was sufficient basis for a judgment against petitioners. From this it is entirely probable that the jury's verdict against both petitioners was based on their finding of a conspiracy among Sunkist, Exchange Orange, and Exchange Lemon. There is no question that Exchange Lemon was identified in the complaint and throughout the trial as an alleged co-conspirator. In no fewer than five instances did the trial court refer to the alleged conspiracy as being among petitioners and the "co-conspirators" or petitioners and Exchange Lemon, TreeSweet, or Silzle. The final summarization on conspiracy was in terms of finding that petitioners combined or conspired with either TreeSweet or Silzle or Exchange Lemon, and the addendum instructions emphasized that the jury could find either or both petitioners had illegally conspired with any one of the alleged co-conspirators. It is true that in some instances the court's conspiracy instructions mentioned only TreeSweet and Silzle as co-conspirators. Conjecture as to the reasons for this would not be fruitful. For it is clear that the court never limited the jury to a consideration of those parties as the sole co-conspirators. And other instructions, including the summarization, allowed the jury to base their verdict upon a finding of an illegal conspiracy solely among Sunkist, Exchange Orange, and Exchange Lemon.

It is suggested by respondents and the court below that petitioners waived their objection to these instructions. This is based on petitioners' acquiescence in the additional instructions, including references to the conspiracy, given the jury after the general charge. But petitioners' actions

here must be viewed in context. Prior to the general charge, conferences of counsel and the trial court were held to discuss the instructions. At each point counsel for petitioners objected to instructions which suggested that the three cooperatives might be found to have illegally conspired among themselves and requested instructions that would have limited a finding of an unlawful conspiracy in this case to one among petitioners and TreeSweet or Silzle. The trial court consistently ruled adversely to petitioners on this point. After the charge was delivered, counsel were told that all prior objections would be preserved and asked if they had any additional objections. In light of this assurance and petitioners' prior objections and requests, we believe the acquiescence in the added instructions could not be considered a waiver.

We are squarely presented, then, with the question of whether Sunkist, Exchange Orange, and Exchange Lemon—the three legal entities formed by these 12,000 growers—can be considered independent parties for the purposes of the conspiracy provisions of §§ 1 and 2 of the Sherman Act. We conclude not. Section 6 of the Clayton Act provides, *inter alia*, that agricultural organizations instituted for the purposes of mutual help shall not be held or construed to be illegal combinations or conspiracies in restraint of trade under the antitrust laws.[7]

---

[7] "Sec. 6. That the labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."

28

The Capper-Volstead Act sets out this immunity in greater specificity:

"That persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes . . . ." [8]

There can be no doubt that under these statutes the 12,000 California-Arizona citrus growers ultimately involved could join together into *one* organization for the collective processing and marketing of their fruit and fruit products without the business decisions of their officers being held combinations or conspiracies. The language of the Capper-Volstead Act is specific in permitting concerted efforts by farmers in the processing, preparing for market, and marketing of their products. And the legislative history of the Act reveals several references to the Sunkist organization—then called the California Fruit Growers Exchange and numbering 11,000 members—including a suggestion by Senator Capper that this was the type of cooperative that would find "definite legalization" under the legislation. [9] Although we cannot draw from these references a knowing approval of the

---

[8] The Act has certain organizational requisites which are not in issue here.

[9] 61 Cong. Rec. 1036 (1921) (remarks of Representative Black); 62 Cong. Rec. 2052 (1922) (Senator Kellogg); 62 Cong. Rec. 2061 (1922) (Senator Capper); 62 Cong. Rec. 2277 (1922) (Senator Walsh).

tripartite legal organization of the 11,000 growers, they do indicate that a cooperative of such size and general activities was contemplated by the Act.

Instead of a single cooperative, these growers through local associations first formed one area-wide organization (Sunkist) for marketing purposes. When it was decided to perform research and processing on a joint basis, separate organizations were formed by the interested associations for reasons outlined above. At a later date one of these (Exchange Orange) was acquired by the Sunkist organization and is presently held as a subsidiary. The other (Exchange Lemon) is still owned by the lemon-grower associations, all of whom are also member associations of Sunkist. With due respect to the contrary opinions of the Court of Appeals and District Court, we feel that the 12,000 growers here involved are in practical effect and in the contemplation of the statutes one "organization" or "association" even though they have formally organized themselves into three separate legal entities. To hold otherwise would be to impose grave legal consequences upon organizational distinctions that are of *de minimis* meaning and effect to these growers who have banded together for processing and marketing purposes within the purview of the Clayton and Capper-Volstead Acts. There is no indication that the use of separate corporations had economic significance in itself or that outsiders considered and dealt with the three entities as independent organizations. That the packing is done by local associations, the advertising, sales, and traffic by divisions of the area association, and the processing by separate organizations does not in our opinion preclude these growers from being considered one organization or association for purposes of the Clayton and Capper-Volstead Acts.

Since we hold erroneous one theory of liability upon which the general verdict may have rested—a conspiracy

among petitioners and Exchange Lemon—it is unnecessary for us to explore the legality of the other theories. As was stated of a general verdict in *Maryland* v. *Baldwin*, 112 U. S. 490, 493 (1884), "[I]ts generality prevents us from perceiving upon which plea they found. If, therefore, upon any one issue error was committed, either in the admission of evidence, or in the charge of the court, the verdict cannot be upheld . . . ." Suffice it to say that our decision in no way detracts from earlier cases holding agricultural cooperatives liable for conspiracies with outside groups, *United States* v. *Borden Co.*, 308 U. S. 188 (1939), and for monopolization, *Maryland & Virginia Milk Producers Assn.* v. *United States*, 362 U. S. 458 (1960).

*Reversed and remanded.*

MR. JUSTICE FRANKFURTER took no part in the decision of this case.

MR. JUSTICE WHITE took no part in the consideration or decision of this case.