557 F.2d 1270
 1977-1 Trade Cases 61,442, 1 Fed. R. Evid. Serv. 716
 UNITED STATES of America, Appellee,
v.
CHAMPION INTERNATIONAL CORPORATION, Appellant.
UNITED STATES of America, Appellee,
v.
YOUNG & MORGAN, INC., and Bugaboo Timber Company, et al.,
Appellants.
UNITED STATES of America, Appellee,
v.
FRERES LUMBER COMPANY, INC., Freres Veneer Company and
Robert T. Freres, Appellants.
 Nos. 75-2866, 75-2867 and 75-2873.
 United States Court of Appeals,
Ninth Circuit.
 May 3, 1977.
As Amended July 20, 1977.
 
 Barnes H. Ellis, argued, Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., for appellant Champion.
 B. Barry Grossman, argued, Atty. At Law, Antitrust Div., Appellate Section, U. S. Dept. of Justice, Washington, D. C., for appellee.
 Jack H. Dunn, argued, Robert R. Carney, Morrison, Dunn, Cohen, Miller & Carney, Portland, Or., for appellants Young & Morgan.
 Norman J. Wiener, argued, Miller, Anderson, Nash, Yerke & Wiener, Portland, Or., for appellants Freres.
 Appeals from the United States District Court for the District of oregon.
 Before GOODWIN and SNEED, Circuit Judges, and POOLE,* District Judge.
 GOODWIN, Circuit Judge:
 
 
 1
 Seven corporate and individual defendants appeal their respective convictions of criminal violations of 15 U.S.C. § 1 et seq., under indictments charging a conspiracy to eliminate competition in the bidding for timber offered for sale by the United States Forest Service.
 
 
 2
 The defendants were engaged in the lumber and plywood business in or near the Detroit Ranger District. The Detroit Ranger District is an administrative division of the Forest Service in Oregon lying between the central Willamette Valley and the summit of the Cascades.
 
 
 3
 After determining the allowable harvest and other factors relevant to the federal timber management program, the district ranger offers for sale at public auction the various tracts of timber scheduled for cutting. Lumber and plywood manufacturers receive announcements sufficiently in advance of each sale so that, as potential buyers, they may decide whether and how much to bid. They evaluate the quality, quantity, and location of the timber, the difficulty of logging, hauling distances, road-building requirements, climate and weather conditions, and other factors that may or may not make a particular sale attractive.
 
 
 4
 All the relevant sale information was made public. But the defendant operators were located in or near the Detroit district and were in a position to supplement the public announcements with their own knowledge of the timber and terrain. More important to bidding, they knew the production capacities and product mixes of their own and neighboring plants. It was the government's theory that the defendants illegally exchanged information, based upon their special knowledge, to restrict bidding. During the period covered by the indictment, the defendants purchased about 90 percent of the sales made by the district.
 
 
 5
 The defendants were convicted of engaging in a combination and conspiracy in restraint of trade. The specific charges were that they entered into a continuing agreement, understanding and concert of action: "(1) to eliminate competitive bidding for United States Forest Service timber; (2) to allocate United States Forest Service timber among themselves; (3) to fix, reduce, and stabilize the price paid for United States Forest Service timber at or near the minimum acceptable bid set by the United States Forest Service, and (4) to bid up any non-conspirator who attempted to bid on United States Forest Service timber." After a trial without a jury, the court found the appellants guilty of the first three specifications.
 
 
 6
 The appellants, challenging the court's findings, point to the undisputed economic and geographic factors relevant to any bidding on timber by the local operators, and argue that there was no conspiracy just the exercise of ordinary common sense by individual bidders who saw no reason to throw their money away, and who were under no legal duty to do so.
 
 
 7
 The government argues that no matter how self-evident the economies of their bidding conduct may have been, independent pursuit of self interest could not overcome the inference of collusion which is almost compelled by the methodical manner in which the defendants took turns acquiring without substantial competition most of the various cutting contracts offered by the Forest Service during the period covered by the indictment.
 
 A. SUFFICIENCY OF EVIDENCE
 
 8
 The district judge, in his written findings, took note of the bidding practices that had prevailed in the region prior to the time covered by the indictment, and observed that the earlier period was marked by intensely competitive bidding, sometimes bringing into government coffers prices three times the appraised value of the timber offered in the auctions. (Trial witnesses had characterized this period as one of a "bidding war".)
 
 
 9
 Prior to 1967, high demand for the various species of timber offered for sale kept local bidding competition at a generally high level. This "bidding war" came to a sudden end on June 2, 1967, when defendant Vernon Morgan "was surprised" to find no one bidding against him at an auction of a small offering of government timber. Morgan decided, he said, "to experiment", and later that same day he offered no bid against defendant Freres on another sale, with the result that Freres took the second sale at a nominal figure over the appraised price.
 
 
 10
 The trial court agreed with the defendants that a new bidding pattern had thus developed by "normal economic forces", presumably in a noncollusive evolution, and it "delighted" the bidders. The court went on to note that for the next two or three logging seasons the defendants were able to buy most of the sales they wanted at prices approximating the government's appraised prices. (If a sale did not bring at least the appraised price, the government would cancel the sale.) But despite the innocent beginnings of the noncompetitive bidding, the trial court found collusion in its continuation.
 
 
 11
 There was evidence that managers or agents of the various defendant entities began meeting from time to time to review the government's forecasts of upcoming sales. At these meetings the operators discussed among themselves which of the sales would be most interesting to each respective bidder. The defendants have always asserted that these meetings were innocent, but the court found otherwise.
 
 
 12
 In a general way, the extent of an individual operator's interest in a future sale could have been predicted by anyone familiar with the operator's hauling distances, his product mix, his manufacturing capacity, and the other factors that determine a sale's relative desirability to that operator. However, the defendants did not leave the exchange of this information to chance. During the time covered by the indictment the defendants advised each other about the future sales upon which they were most likely to bid. Whether or not anyone ever agreed at those meetings to bid or to refrain from bidding in any way, there was no doubt that the defendants "had an understanding" about bidding.
 
 
 13
 The government was unable to introduce direct evidence of an express agreement, but argues that the circumstantial evidence proved the existence of the tacit agreement found by the judge. We agree.
 
 
 14
 The trial judge was not convinced beyond a reasonable doubt that the defendants were guilty of "bidding up" outsiders with the requisite illegal purpose. But this failure of proof does not undermine the ultimate finding of a violation of the Sherman Act as charged in the other specifications of the indictment.
 
 B. INTERSTATE COMMERCE
 
 15
 Even if activities alleged to be illegal are wholly intrastate, the requisite jurisdiction under the Sherman Act can be found if the activities substantially affected interstate commerce. Teamsters Local 167 v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804 (1934). From evidence produced at trial, the judge found that the charged conspiracy had a substantial effect on interstate commerce. The substantiality of the effect of a restraint on interstate commerce must be measured by the substantiality of the interstate commerce which is touched by the restraint, and not by the competitive impact of the restraint. Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). There was no error in finding the necessary effect upon commerce.C. SPECIFIC INTENT
 
 
 16
 Champion argues that in "specific intent cases" it must be shown that the conspiracy was knowingly formed, and that the defendant willfully participated in the unlawful plan. However, under the Sherman Act no specific intent need be shown. As the Supreme Court stated in United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942):
 
 
 17
 " * * * And as respects statements of various appellees that they did not intend to join a combination or to fix prices, we need only say that they 'must be held to have intended the necessary and direct consequences of their acts and cannot be heard to say the contrary.' United States v. Patten, 226 U.S. 525, 543, 33 S.Ct. 141, 145, 57 L.Ed. 333 * * *." 316 U.S. at 275, 62 S.Ct. at 1684.
 
 
 18
 In Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 284 F.2d 1 (9th Cir. 1960), rev'd on other grounds, 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962), this court held that in a Sherman Act case, it is "not necessary to find a specific intent to restrain trade or eliminate a competitor * * *." 284 F.2d at 26.
 
 D. USE OF GRAND JURY TRANSCRIPT
 
 19
 Defendant Freres contends that the district court erred in permitting the government to read portions of a grand jury transcript during trial. Prior inconstistent testimony of a witness before a grand jury is admissible as substantive evidence if the same witness testifies at the trial. Fed. R. Evid. 801(d)(1)(A). The portions read were admissible under the cited rule, even though some of the grand jury testimony had been elicited by means of leading questions. There was no error.
 
 
 20
 The judgments are affirmed.
 
 
 
 *
 The Honorable Cecil F. Poole, United States District Judge for the Northern District of California, sitting by designation