**GVF CANNERY, INC., Plaintiff,**

**v.**

**CALIFORNIA TOMATO GROWERS ASSOCIATION, INC., an Agricultural Bargaining Association; Lester S. Heringer, an individual; John H. Kantz, an individual; Jack A. Hayes, an individual; Robert F. Holt, an individual; California Canners and Growers, an Agricultural Cooperative Association; and Tri-Valley Growers, an Agricultural Cooperative Association, Defendants.**

**C 80–1414 RPA.**

United States District Court,
N. D. California.

April 15, 1981.

---

Lawrence Alioto, San Francisco, Cal., for plaintiff.

Loyd W. McCormick, Warren E. George, Samuel D. Hinkle, Stephen A. Zovickian, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendants California Canners and Growers, and Lester S. Heringer.

A. James Roberts, III, Merrick J. Bobb, R. Scott Jenkins, Tuttle & Taylor, Los Angeles, Cal., for defendants Tri-Valley Growers, and John H. Kautz.

Larry B. Dent, Dent & Brummitt, Oakland, Cal., for defendant CTGA.

## OPINION AND ORDER

AGUILAR, District Judge.

Plaintiff Garden Valley Foods (GVF), a privately owned California corporation engaged in the canning and processing of tomatoes, has sued the seven defendants in this action for various antitrust violations. Defendant California Tomato Growers Association (CTGA) is a non-profit agricultural cooperative association of tomato farmers who sell to canners. Since 1973, CTGA has engaged in collective bargaining with various tomato processors in order to obtain an adequate price for their members' tomatoes. Although not all California tomato growers are CTGA members, a large portion are.

Defendants California Canners and Growers (Cal-Can) and Tri-Valley Growers (Tri-Valley) are agricultural cooperative associations that engage in the processing, marketing, and selling of canned fruits and vegetables, including canned tomato products, delivered to them by their grower-members. The manner in which the farmer-owned cooperatives operate necessitates a brief explanation.

California canneries can be divided into three groups. First, there are the small privately held companies such as plaintiff GVF. Second, there are the farmer-owned cooperative canneries such as Cal-Can and Tri-Valley. The third category is comprised of large publicly held corporations.

Member-growers of a cooperative cannery deliver their produce directly to the cooperative's facilities. Once processed, the goods are canned and sold to retail food chains, remanufacturers, food service companies, etc. Upon delivery of the produce to the cooperative, the grower-member is

credited with an amount determined by the cooperative's board of directors to equal the current commercial value of the raw products. The amount generated from the sale of the canned goods, less applicable operating costs, is later distributed among the members of the cooperative proportionately, according to the value of the share they contributed. Of course, any losses (the result of sales by the cooperative at less than the value for which the members received credit) are also shared by the cooperative's participants. Some cooperatives, such as Tri-Valley, operate under a so-called "single pool" system, where different types of commodities delivered to the cooperative are credited to one pool. The canning cooperatives may make cash advances, in varying amounts, to members upon the delivery of produce. Such advances typically represent an established percentage of the total value of the produce contributed by the member.

The complaint also names four individuals as defendants—Messrs. Heringer, Hayes, Holt and Kantz; each of these individuals had at one time been an officer or director of one of the three agricultural cooperatives that is defendant herein.

*Plaintiff's Claims.*

GVF's claims against defendants are founded in anti-trust. Specifically, GVF makes the following allegations:

1. That Tri-Valley and Cal-Can combined with CTGA to restrain trade by fixing the price of canning tomatoes, in violation of Sherman Act § 1;

2. That Tri-Valley and Cal-Can combined with each other and CTGA to monopolize non-brand name tomato canning in California, in violation of Sherman Act § 2.

3. That Tri-Valley and Cal-Can conspired to monopolize certain submarkets of processed tomato products, in violation of Sherman Act § 2;

4. That CTGA attempted to monopolize and did monopolize the sale of canning tomatoes in California, in violation of Sherman Act § 2;

5. That the individual defendants participated in these alleged unlawful activities; and

6. That Tri-Valley and Cal-Can engaged in price discrimination unlawful under the Robinson-Patman Act.

Defendants have moved, inter alia, for judgment on the pleadings as to the Sherman Act §§ 1 and 2 claims and for a dismissal or striking of the Robinson-Patman allegations.

*The Sherman Act § 1 Claim.*

Plaintiff claims that Tri-Valley, Cal-Can and CTGA violated § 1 of the Sherman Act by combining with each other to fix the price of canning tomatoes. Price fixing arrangements generally represent *per se* violations of § 1. See *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). However, the Capper-Volstead Act, 7 U.S.C. § 291, 292, permits certain conduct by agricultural associations which would otherwise be prohibited by the antitrust laws. The Act, in its relevant part, states:

"Persons engaged in the production of agricultural products ... may act together in associations, corporate or otherwise ... in collectively processing, preparing for market, handling, and marketing in foreign and interstate commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes." 7 U.S.C. § 291.

The courts have broadly interpreted this statute to afford farmers' associations significant exemptions from the antitrust laws. See, e. g., *Maryland and Virginia Milk Producers Association v. United States,* 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960); *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.,* 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962); *Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc.,* 497 F.2d 203 (9th Cir. 1974), *cert. denied,* 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974).

Generally, the Capper-Volstead Act allows agricultural producers to act in

association "[to] make the necessary contracts to accomplish their legitimate purpose." *Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc., supra,* 497 F.2d at 214. This court has held that price fixing is a legitimate purpose under the Act. See *Northern California Supermarkets, Inc. v. Central California Lettuce Producers Cooperative,* 413 F.Supp. 984 (N.D.Cal.1976), aff'd. 580 F.2d 369 (9th Cir. 1978), *cert. denied,* 439 U.S. 1090, 99 S.Ct. 873, 59 L.Ed.2d 57 (1979). Plaintiff apparently contends that while individual farmers may combine within *one* organization to pursue their legitimate purposes, Capper-Volstead protection is lost when two or more such organizations associate for the same reasons. This argument, however, has been soundly rejected by previous decisions. For example, the court in *Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc., supra,* 497 F.2d at 214, stated that:

> "If Section 1 of the Capper-Volstead Act, 7 U.S.C. § 291, permits a common marketing agency, separate from the cooperatives themselves, it would follow that *without* such a separate agency, the associations may act together in marketing and make the necessary contracts to accomplish their legitimate purpose."

See *Fairdale Farms, Inc. v. Yankee Milk, Inc.,* 635 F.2d 1037 (2d Cir. 1980). In short, that which agricultural producers may combine to accomplish within a single association, they may lawfully combine to achieve by way of multiple organizations. "To hold otherwise would be to impose grave legal consequences upon organizational distinctions that are of de minimis meaning and effect." *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., supra,* 370 U.S. at 29, 82 S.Ct. at 1135. Of course, this exemption would be forfeited were any of the associated parties "non-producers"; however, Tri-Valley, Cal-Can and CTGA are each "producers" under the Act. See *Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc., supra,* 497 F.2d at 216. Accordingly, since price fixing is a legitimate Capper-Volstead purpose, and since two or more agricultural associations may act together in the furtherance of such legitimate activities, the alleged conduct of Tri-Valley, Cal-Can and CTGA is protected from the dictates of Sherman Act § 1.

*The Sherman Act § 2 Claims.*

Plaintiff's Sherman Act § 2 claims focus upon: (1) an alleged combination among Tri-Valley, Cal-Can and CTGA to monopolize non-brand name tomato canning in California; (2) an alleged conspiracy between Tri-Valley and Cal-Can to monopolize certain submarkets of processed tomato products; and (3) an alleged monopolization of and attempt to monopolize the sale of canning tomatoes in California by CTGA.

■ Although Sherman Act § 2 makes it unlawful for any person to monopolize, attempt to monopolize, or conspire with another to monopolize trade, there exists an "inherent conflict between this provision and those of Capper-Volstead which legitimize the collective action of farmers in the marketing of their products." *Fairdale Farms, Inc. v. Yankee Milk, Inc., supra,* 635 F.2d at 1040. Just as Capper-Volstead protects certain conduct from § 1 of the Sherman Act, it also shields certain combinations or conspiracies to monopolize between or among agricultural associations from the limitations of Sherman Act § 2. See *Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc., supra.* It would be anomalous indeed to hold that a defendant agricultural association's alleged § 1 combination constituted a legitimate Capper-Volstead purpose, while claims based upon the same facts which are brought under § 2 are not similarly protected. Since both the § 1 claim and the § 2 combination and conspiracy claims in the instant case are predicated upon defendants' alleged price fixing, and since the Court has already established with regard to § 1 that price fixing is a legitimate Capper-Volstead purpose, the Court holds that the alleged § 2 violations are also immunized.

"It is not unlawful under the antitrust acts for a Capper-Volstead cooperative . . . to try to acquire even 100% of the market if it does it exclusively through marketing

agreements approved under the Capper-Volstead Act." *Cape Cod Food Products v. National Cranberry Association,* 119 F.Supp. 900 (D.Mass.1954). Because an agricultural cooperative may lawfully achieve 100% of a market, it necessarily follows that two or more such organizations may together hold such monopoly power. A contrary holding would "impose grave legal consequences upon organizational distinctions that are of de minimis meaning and effect ...." *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., supra,* 370 U.S. at 29, 82 S.Ct. at 1135. Given that price fixing is a legitimate Capper-Volstead purpose—even where such activity fosters a monopoly of one or more agricultural associations—the § 2 combination and conspiracy allegation must fall under the weight of Congress's intent to immunize such conduct from the antitrust laws.

The only limitation upon attempts, conspiracies, or combinations to monopolize undertaken by Capper-Volstead organizations is that such groups may "neither acquire nor exercise monopoly power in a predatory fashion ...." *Fairdale Farms, Inc. v. Yankee Milk, Inc., supra,* 635 F.2d at 1044. See *Maryland and Virginia Milk Producers Association v. United States, supra,* 362 U.S. at 463, 80 S.Ct. at 851. The types of predatory conduct necessary for holding an agricultural association liable under § 2 are well established. See *Otto Milk Co. v. United Dairy Farmers Cooperative Association,* 388 F.2d 789 (3d Cir. 1967) (picketing); *North Texas Producers Association v. Metzger Dairies, Inc.,* 348 F.2d 189 (5th Cir. 1965), cert. denied, 382 U.S. 977, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966) (boycotts and coercion); *Gulf Coast Shrimpers and Oystermans Association v. United States,* 236 F.2d 658 (5th Cir. 1956), cert. denied, 352 U.S. 927, 77 S.Ct. 225, 1 L.Ed.2d 162 (1956) (coerced membership); *Knuth v. Erie-Crawford Dairy Cooperative Association,* 395 F.2d 420 (2d Cir. 1968) (price discrimination); *Bergjans Farm Dairy Co. v. Sanitary Milk Producers,* 241 F.Supp. 476 (E.D.Mo.1965) aff'd. 368 F.2d 679 (8th Cir. 1966) (payment of secret rebates). Since no such predatory behavior by defendants has been demon-

strated, the alleged combination and conspiracy to monopolize are not actionable.

▉ Plaintiff's other § 2 claim is that CTGA attempted to and did monopolize the sale of canning tomatoes in California. Plaintiff, citing the monopoly test enunciated in *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1965) argues that in order to sustain its § 2 allegation against CTGA it need only demonstrate CTGA's "willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident." At least one Ninth Circuit decision has applied the *Grinnell* standard to § 2 monopolization claims against agricultural associations. See *Case-Swayne Co. v. Sunkist Growers, Inc.,* 369 F.2d 449, 458 (9th Cir. 1966). However, the Court does not believe that this decision demands "the full application of the second element of [the *Grinnell*] test to agricultural cooperatives." *Fairdale Farms, Inc. v. Yankee Milk, Inc., supra,* 635 F.2d at 1045. The Court views the principle articulated by the Second Circuit in the *Fairdale Farms* case as the controlling statement of law on this subject, and interprets *Case-Swayne* to be consistent with this expression:

> "[W]hile the formation, growth and operation of a powerful cooperative is obviously a 'willful acquisition or maintenance of such power,' and will rarely result from 'a superior product, business acumen, or historic accident,' id., it is exactly what Capper-Volstead permits .... It is not a violation of the Sherman Act for the members of an agricultural cooperative to carry out the legitimate objectives of their association which follow naturally from their attempts to achieve unity of effort and the voluntary elimination of competition among themselves. [Cites omitted]" *Id.*

The *Case-Swayne* court defined the second element of the *Grinnell* test, at least with regard to allegations of monopolization against agricultural cooperatives, to

render unlawful "the wrongful use and exercise of [monopoly] power ...." *Case-Swayne Co. v. Sunkist Growers, Inc., supra,* 369 F.2d at 458. Given its recognition that legitimate Capper-Volstead purposes are immune from Sherman Act prohibitions, the court certainly could not have meant that such activities constituted a "wrongful use or exercise of [monopoly] power ...." What the *Case-Swayne* decision does stand for, however, is that where there are a number of alleged predatory acts—such as boycotts, coercion, etc.—each of which alone may be insufficient to establish wrongful use of monopoly power, this conduct must be "viewed as a whole" to determine whether a cause of action under § 2 lies. *Case-Swayne Co. v. Sunkist Growers, Inc., supra,* 369 F.2d at 459. The opinion does not suggest that legitimate Capper-Volstead activities may form the basis for a § 2 allegation. In short, *Case-Swayne* merely reaffirms the principle that plaintiffs charging an agricultural cooperative with monopolization must establish specific acts, predatory in nature, which fall outside the purview of legitimate Capper-Volstead purposes.

None of CTGA's alleged activities, as characterized in plaintiff's complaint, constitute predatory acts. Plaintiff specifically claims that CTGA attempted to and did monopolize the sale of canning tomatoes in California by the use of the following "restrictive" practices:

1. A provision in the CTGA membership agreement that members' terms must cover a period of at least two years;

2. A requirement that CTGA members sell their tomatoes to canneries only at the minimum prices, terms, and conditions fixed, established, and approved by the CTGA; and

3. A provision that the CTGA membership agreement will not be effective unless growers representing at least 65% of California's tomato acreage became members.

In *Treasure Valley, infra,* similar activities by an agricultural association were held to be protected by Capper-Volstead, and not to be predatory. See *Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc.,* 497 F.2d at 215 n.9. The Court views the three challenged contract provisions as practices undertaken in the promotion of proper Capper-Volstead purposes. Such activities were obviously contemplated by the Act. *Id.* Plaintiff has failed to specify any acts by CTGA which constitute the requisite predation to trigger the operation of Sherman § 2; there are alleged no pickets, no boycotts,[1] no payments of secret rebates, no active coercive tactics—in short, no "competition-stifling practices" disapproved by Capper-Volstead. Accordingly, the Court holds that plaintiff's complaint fails to state a sufficient cause of action against CTGA under § 2.

During oral argument, plaintiff's counsel alluded to the possibility that defendants engaged in predatory acts against the plaintiff which were not explicated in the complaint. The Court will afford plaintiff the opportunity to amend its complaint so as to include these alleged acts, but it must admonish plaintiff's counsel that mere insertion of the word "predatory" at various portions of the complaint is insufficient to support the § 2 allegations. Judgment on the pleadings shall be entered in defendants' favor unless plaintiff can demonstrate to the Court, by the amendment of its complaint within 60 days of the filing of this Order, that defendants engaged in predatory behavior, as defined in the above cases.

*The Sherman Act Claims Against the Individual Defendants.*

 The Court has above held that plaintiff's complaint fails to state a sufficient cause of action under Sherman Act §§ 1 and 2 against the corporate defendants. This same conclusion applies to allegations against the individual defendants, who were officers and directors of the three agricultural organizations. Even if the

---

1. The so-called "boycott" complained of here was simply the refusal of CTGA members to sell at less than the established price. Such practice is not a "boycott," but a proper means to effectuate a legitimate Capper-Volstead purpose. See *Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc., supra.*

Sherman Act claims against the association were adequate, the claims against the individual defendants fail to satisfy the standard established by this Court with regard to personal · liability under the antitrust laws. The *Murphy Tugboat* decision requires that the liability of officers and directors is limited to participation in "inherently wrongful conduct." *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co., Ltd.,* 467 F.Supp. 841, 853 (N.D.Cal. 1979). Since plaintiff GVF does not allege any "inherently wrongful conduct" by the individual defendants, judgment on the pleadings in their favor must be entered.

*The Robinson-Patman Claims.*

■ Plaintiff claims that defendants Tri-Valley and Cal-Can violated the Robinson-Patman Act, 15 U.S.C. § 13(a), by having "sold processed tomato products at discriminatory prices and below marginal costs." (Plaintiff's complaint at ¶ 19). Such a bare, conclusory allegation does not set forth a basis for relief under the Act. See *Baum v. Investors Diversified Services, Inc.,* 286 F.Supp. 914 (N.D.Ill.1968), *aff'd.* 409 F.2d 872 (7th Cir. 1969). Moreover, plaintiff has failed to specify in its complaint the six separate jurisdictional elements necessary to sustain a Robinson-Patman claim. See *Rutledge v. Electric Hose & Rubber Co.,* 511 F.2d 668 (9th Cir. 1975). These inadequacies demand dismissal of the purported Robinson-Patman allegation.

*Conclusion.*

While three other motions not discussed above are currently pending (defendant Cal-Can's motion to dismiss the action or strike ¶ 24 of the complaint based upon deponent Orlando's failure to answer questions; defendant Cal-Can's motion for sanctions; and defendant CTGA's motion for leave to file counterclaims), the Court's disposition of the Sherman Act and Robinson-Patman Act claims makes consideration of these three motions unnecessary. Hence, the Court will deny these three motions without prejudice.

Accordingly, IT IS HEREBY ORDERED that:

1. The motion of defendants Heringer, Hayes, Holt and Kautz for judgment on the pleadings is granted in their favor;

2. The motion of defendants Tri-Valley, Cal-Can and CTGA for judgment on the pleadings on the Sherman § 1 claims is granted in their favor;

3. The motion of defendants Tri-Valley, Cal-Can and CTGA for judgment on the pleadings on the Sherman § 2 claims shall remain pending for 60 days from the filing of this Order, or until plaintiff amends its complaint, whichever occurs first;

4. The motion of defendants Tri-Valley and Cal-Can for dismissal of the Robinson-Patman claims is granted;

5. The motion of defendant CTGA for leave to file counterclaims is denied without prejudice;

6. The motion of defendant Cal-Can for dismissal or the striking of ¶ 24 of the complaint is denied without prejudice; and

7. The motion of defendant Cal-Can for sanctions is denied without prejudice.

The appropriate judgment will be entered.