59 F.3d 166
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Jeffrey HENDERSON, Plaintiff-Appellant,
v.
Andrew WINSTON, Sheriff of Richmond City Jail, in his
individual capacity, Defendant-Appellee.
 No. 94-2071.
 United States Court of Appeals, Fourth Circuit.
 Argued May 1, 1995.
Decided June 27, 1995.
 
 ARGUED: Gerald Thomas Zerkin, Gerald T. Zerkin & Associates, Richmond, VA, for appellant. Robert A. Dybing, Shuford, Rubin & Gibney, P.C., Richmond, VA, for appellee. ON BRIEF: Robert Godfrey, Gerald T. Zerkin & Associates, Richmond, VA, for appellant. John A. Gibney, Jr., Shuford, Rubin & Gibney, P.C., Richmond, VA, for appellee.
 Before HALL, WILKINSON, and HAMILTON, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Appellant Jeffrey Henderson brought this action under 42 U.S.C. Sec. 1983 against his former employer, appellee Andrew Winston, Sheriff of the Richmond City Jail, alleging that he was terminated from his position as deputy sheriff without due process, and was stigmatized by the attendant publicity. The case was heard before a jury, which rejected Henderson's cause of action. Henderson now seeks to avoid that result by raising several claims of error, including failure to order a new trial, flawed jury instructions, and prejudicial statements by the trial judge. We find that these claims are meritless, and see no reason to disturb the result reached by the jury.
 
 I.
 
 2
 On June 1, 1993, an inmate named Robert Bills attempted to escape from the Richmond City Jail by disguising himself as another inmate, Michael Anderson, who was scheduled for release at the Richmond City Lock-up several blocks from the jail. Bills managed to get as far as the Lock-up facility before the attempt was foiled. An investigation of the escape attempt was initiated that same evening by Alan Roehm of the Jail Internal Affairs Department. During his investigation, Roehm discovered a piece of paper in Bills' possession with Jeffrey Henderson's phone number written on it. At the time, Henderson was employed as a deputy sheriff at the City Jail. Bills told Roehm that Henderson had supplied a print-out of information about Michael Anderson that aided in the escape attempt.
 
 
 3
 The next day, Internal Affairs taped a telephone conversation between Bills and Henderson. It was obvious from the conversation that the two knew each other. In the course of their discussion, Bills mentioned that Henderson had failed to meet Bills' friend, Carolyn Hawley, at the Lock-up as planned. Henderson acknowledged that he had missed her because he was waiting at the back of the Lock-up instead of the front. Bills also asked Henderson if he was "going to try it again," but Henderson did not respond directly. Finally, Bills asked if Henderson knew what had "happened," and Henderson replied that he didn't know, but would find out.
 
 
 4
 Several days later, on June 6, Bills successfully escaped from the City Jail by removing an air conditioning unit from a window and jumping out. Bills remains at large today. After Bills' escape, Internal Affairs and State Police investigators questioned Henderson. Upon being confronted with the tape of his phone conversation, Henderson confessed that he knew Bills and that he had agreed to help Bills get bonded out of jail. Henderson had gone so far as to inquire of a local bondsman about bond for Bills. Moreover, Henderson admitted to investigators that he had discussed going into the bounty-hunting business with Bills. In particular, Henderson stated that Bills had promised to pay him $15,000 for aid in catching a fellow inmate who had skipped bond. Henderson knew that this association with Bills violated several Jail rules against fraternization with inmates.
 
 
 5
 When Internal Affairs investigators presented this information to Sheriff Winston, Henderson's superior, Winston concluded that Henderson had been involved in at least the attempted escape of June 1, and had violated Jail rules by associating with Bills. Accordingly, on June 9, Winston terminated Henderson. Another Deputy, Arthur Coleman, was fired for gross negligence in facilitating the successful escape on June 6 by letting Bills out of his cell.
 
 
 6
 After Bills' escape, Winston held a press conference at the Richmond City Jail. The story was carried by both print and TV media. At the conference, Winston was quoted as saying that he believed Henderson was "somehow involved" in the June 1 escape attempt, and had been fired for that reason. Winston further stated that Deputy Coleman had been fired in connection with the June 6 escape. Several newspaper reports noted that Henderson was not on duty at the jail the night of the successful escape.
 
 
 7
 Henderson then brought this Sec. 1983 action against Winston. He alleged that Winston's actions in terminating his employment, publicizing false statements about that termination, and then denying Henderson a name-clearing hearing served to deny Henderson due process of law. See Board of Regents v. Roth, 408 U.S. 564, 573 (1972). Henderson argued that he had specifically requested a hearing in a letter of June 22, 1993, but that no hearing was ever held. He further alleged that Winston's statements at the press conference had given the false impression that Henderson was involved in the successful June 6 escape as well as the June 1 attempt. Winston's principal defense was that his statements to the media were not inaccurate, but were fully supported by the evidence of Henderson's misdeeds.
 
 
 8
 The case was heard before a jury in May of 1994. A number of persons testified, including Hawley, Henderson, Winston, and Roehm. Hawley confirmed that she had worked with Henderson in trying to get Bills bailed out of the jail. She also stated she had planned to meet with Henderson, although her recollection was that this meeting was supposed to be at the jail, not the Lock-up. During cross-examination, however, Henderson himself admitted that he had agreed to meet Hawley at the Lock-up on the day of the escape attempt, though he modified this story somewhat on re-direct in an apparent attempt to match Hawley's story.
 
 
 9
 At the close of plaintiff's evidence, the court reminded the jury not to pay attention to news reports about the trial because such reports are "usually very inaccurate." Henderson moved for a mistrial after this statement, which the court denied. Henderson then submitted proposed jury instructions stating that four of the five elements of his due process claim were established as a matter of law in his favor, and that the only question for the jury was whether Winston's public statements were materially false. The trial court refused this proposed instruction and submitted all elements of the Sec. 1983 claim to the jury.
 
 
 10
 The jury returned a verdict for Winston. Henderson then moved for a new trial under Fed.R.Civ.P. 59. On July 17, 1994, the district court denied that motion. The court found that the jury verdict was not against the clear weight of the evidence because, for one thing, Henderson had "blatantly contradicted himself on the stand," and thus the jury "could have easily and reasonably" concluded Winston's statements were not false. Henderson now appeals.
 
 II.
 A.
 
 11
 We begin with Henderson's claim that the jury verdict was against the clear weight of evidence and should have been overturned. The denial of a motion for a new trial will be reversed only if the trial court abused its discretion in concluding that the jury verdict was valid. Lindner v. Durham Hosiery Mills, Inc., 761 F.2d 162, 168 (4th Cir.1985).
 
 
 12
 To show a violation of due process, Henderson had to prove five basic elements: 1) a substantially false statement attributable to the defendant; 2) that was public; 3) made in connection with a termination; 4) without a hearing; and 5) that stigmatized the plaintiff and affected future employment opportunities. Schneeweis v. Jacobs, 771 F.Supp. 733 (E.D. Va.1991), aff'd without op., 1992 LEXIS 15623 (4th Cir.1992). In this case, the inquiry focused on the first element, i.e., whether Winston's statements accusing Henderson of involvement in the escape attempt were substantially false. Henderson contends that the jury improperly concluded that he was indeed a party to the June 1 escape attempt. Further, he argues that the jury failed to find that Winston was responsible for additional "implications" in the media stories suggesting Henderson was also involved in the successful June 6 escape.
 
 
 13
 We do not agree. The trial court's conclusion that the jury verdict was supported by the weight of the evidence was manifestly correct. There is ample evidence demonstrating that Winston's statements were not false, because Henderson was indeed "somehow involved" in the June 1 escape attempt. It is essentially undisputed that Henderson at the very least planned to meet with Bills' friend Hawley. Henderson's own testimony indicated that he tried to meet Hawley at the Lock-up on June 1. After initially maintaining that he was supposed to meet her at the jail, not the Lock-up, Henderson changed his story after being reminded of his statements in the recorded phone conversation of June 2. He also conceded that the date of the planned meeting was the day of the escape, June 1. Moreover, Henderson freely admitted that he had associated with Bills and had helped him try to get bond, and acknowledged that this relationship violated several jail rules.
 
 
 14
 In addition, the jury heard evidence about the recorded conversation between Bills and Henderson. The discussion between the two is filled with revealing references to the failed meeting of June 1, "trying it again," and finding out what had "happened." A cursory review of the transcript of that call raises serious suspicions about Henderson's connection to Bills and his escape plans. Finally, the jury heard testimony from investigator Roehm, who described the piece of paper with Henderson's phone number that was found in Bills' possession at the time of his attempted escape.
 
 
 15
 This amounts to strong proof that Henderson was at least "somehow involved" in the June 1 incident. Winston's uncontested testimony was that his statements to the press clearly implicated Henderson in only the attempted escape, and that the decision to fire Henderson was based on the recorded phone conversation.* Thus, Winston's statement to the press was not substantially false, and the district court's refusal to overturn the jury verdict was therefore not an abuse of discretion.
 
 B.
 
 16
 Next, we address appellant's contention that the court's jury instructions erroneously submitted undisputed elements of the claim to the jury. Henderson speculates that because a general verdict was issued, it is possible that the jury actually found Winston's statements were false, but erroneously held against the plaintiff on one of the supposedly undisputed factors.
 
 
 17
 Jury instructions are only erroneous if they are inaccurate on the law or tend to confuse or mislead the jury. Spell v. McDaniel, 824 F.2d 1380, 1395 (4th Cir.1987), cert. denied sub nom., City of Fayetteville v. Spell, 484 U.S. 1027 (1988). Furthermore, errors in jury instructions are subject to harmless error analysis. Wellington v. Daniels, 717 F.2d 932, 938 (4th Cir.1983). Any error must have been prejudicial to the complaining party in order to mandate reversal. This holds true when the alleged error is the submission of undisputed questions to the jury. Ollier v. Lake Central Airlines, Inc., 423 F.2d 554 (6th Cir.1970).
 
 
 18
 Here, even if the trial court did err by submitting "undisputed" elements of the claim to the jury, no reversal is required because Henderson did not suffer any prejudice. As noted above, the uncontested facts show Winston's statement to the press was substantially true. Henderson conceded that Winston's statements dealt solely with his alleged involvement in the June 1 escape attempt. He also admitted that 1) he did have an improper relationship with Bills; and 2) that he did plan to meet Bills' friend on the day of the escape attempt at the Lock-up, where Bills would have emerged had the attempt succeeded. Because Winston's statement to the press was only that Henderson was "somehow involved" in the June 1 incident, it was not false, and therefore Henderson's whole claim failed as a matter of law. There is no way a reasonable jury could have held for the plaintiff, meaning that there was no prejudice here.
 
 
 19
 Moreover, even if the lack of falsity had not been so conclusively established, Henderson still would not have suffered any prejudice from the jury instructions. The entire trial centered around the falsity issue, and there is simply no chance that the jury's decision rested on any other basis. The vast bulk of the evidence presented at trial dealt with whether or not Henderson was involved in the escape attempt, and, consequently, whether Winston was correct to accuse him. Every witness dwelt on either the nature of Henderson's involvement with Bills or the content of Winston's comments to the media. The other elements of the claim were not the subject of significant discussion before the jury. Indeed, Henderson's own brief on appeal notes that the only element of the claim which was debated at trial was the issue of substantial falsity.
 
 
 20
 Henderson's suggestion that the jury might have rested its verdict on some other element is therefore not persuasive. When the whole trial revolved around the issue of truth versus falsity, it is implausible to speculate that the jury bypassed this issue and focused on some subsidiary question, while simultaneously ignoring the weight of the evidence to conclude that Winston's statement was false. Henderson failed to object to the general verdict form or request special interrogatories, and so this speculation is all he can offer. Raw conjecture of this sort is not sufficient to overturn a jury verdict. See Knight v. Texaco, Inc., 786 F.2d 1296, 1299 (5th Cir.1986). Because the basis of the jury's decision had to be a finding of an absence of falsity, the allegedly erroneous instructions were not prejudicial.
 
 
 21
 Nevertheless, appellant maintains that when an undisputed element in a multi-element claim is erroneously submitted to a jury, a general verdict must be reversed because of the possibility that the verdict rested on a jury mistake as to the undisputed element. Appellant points to the decision in Sunkist v. Winckler & Smith Co., 370 U.S. 19 (1962), which held that when one of several theories of liability submitted to a jury is held erroneous, a general verdict must be reversed because it may have rested on the erroneous theory. 370 U.S. at 29-30. The rationale for the Sunkist rule, however, is that a reviewing court cannot be certain that the legal basis for the verdict was valid, meaning that prejudice is necessarily established. Here, by contrast, there was only one theory of liability pressed, and there is no doubt that the critical factual issue of falsity went against the plaintiff. Hence, even if the jury did err on one of the other elements, the verdict for defendant was still unquestionably valid. A general verdict may be upheld in such circumstances, "where it is reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it." Braun v. Flynt, 731 F.2d 1205, 1206 (5th Cir.1984). The fact that appellant was in no sense prejudiced by the alleged error remains the dispositive point.
 
 C.
 
 22
 Finally, appellant takes issue with the trial court's statement to the jury instructing it to ignore media reports about the trial because such reports can be "inaccurate." Henderson contends that this statement was prejudicial. This is not a serious argument. The court was merely reminding the jury not to listen to news reports about the ongoing litigation, not telling them how to interpret the media reports at issue in the case itself. At any rate, trial courts are entitled to a considerable degree of deference regarding comments made to the jury. Relief will not be granted unless a court's comments were so one-sided as constitute advocacy. Garrett v. Deas Industries, Inc., 705 F.2d 721 (4th Cir.1983). No such degree of prejudice is apparent here.
 
 III.
 
 23
 For the foregoing reasons, the judgment in this case is
 
 
 24
 AFFIRMED.
 
 
 
 *
 Appellant's additional argument that Winston also accused him of involvement in the June 6 escape is not supported by the record. When asked what he told the press about Henderson's involvement on June 6, Winston replied, "Nothing." Moreover, Henderson openly conceded during the trial that Winston's statement did not implicate him in the successful escape