Richard Norman TEXTOR, Plaintiff,

v.

Richard B. CHENEY, et al.,
Defendants.

Civ. A. No. 90–1143.

United States District Court,
District of Columbia.

Jan. 29, 1991.

Cornish Hitchcock, Alan Morrison, Washington, D.C., for plaintiff.

Mark Nagle, U.S. Attorney's Office, Washington, D.C., for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

This case is before the Court on cross-motions for summary judgment. Mr. Textor is challenging his three-year debarment from government surplus auctions. He asserts that the decision to debar him was arbitrary, capricious, an abuse of discretion and in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) ("APA"). He further asserts that he was debarred in retaliation for his efforts to publicize the waste and abuses which he observed at these auctions. In its cross-motion for summary judgment, the government asserts that the decision to debar Mr. Textor is supported by the administrative record and, therefore, was not arbitrary, capricious or an abuse of discretion. Further, the government argues that the procedure by which Mr. Textor was debarred violated neither the APA nor the Fifth Amendment right to due process.

For the reasons set forth below, Plaintiff's Motion for Summary Judgment shall be denied and Defendant's Motion for Summary Judgment shall be granted.

## STATEMENT OF THE CASE

In order to determine whether the plaintiff's debarment was based on sufficient evidence, the Court must review the entire administrative record.[1] Plaintiff Richard Norman Textor attended government auctions and bid on surplus items until debarment charges were filed against him. The Department of Defense ("DOD"), through the Defense Reutilization and Marketing Service ("DRMS") of its Defense Logistics Agency ("DLA"), holds auctions at which members of the public bid for surplus government property. The DLA provides logistical support in the areas of contracting supply, contract administration and technical services to the military, federal civil agencies and foreign governments. The DRMS is responsible for the reuse, sale, and disposal of DOD surplus personal property worldwide. This property is often sold at public auctions. At these auctions, bidders are frequently able to purchase new merchandise for very little money.

In November 1986, an agent of the Defense Criminal Investigative Service ("DCIS") first became acquainted with the plaintiff at an auction in Brandywine, Maryland. At that auction, Mr. Textor had inadvertently purchased a tank scope which was included as part of a lot identified as "aircraft equipment." This scope, which is used for launching missiles from an M-1 tank, cost DOD $285,000.00 new, but Mr. Textor obtained the entire lot for a total of $50. According to Mr. Textor, he showed the scope to two individuals whom he had met at these auctions, William Christiansen and Ronny Lusk. He commented to them about how such equipment could fall into the hands of foreign governments. At that time, Messrs. Christiansen and Lusk were undercover investigators who were part of an investigation being conducted by DCIS at several surplus property auctions on the East Coast. Both men testified against plaintiff at the hearing which led to his debarment.

According to Messrs. Christiansen's and Lusk's hearing testimony, Mr. Textor's comments concerning the tank scope suggested to them that Mr. Textor was ready to sell this scope to a Middle Eastern country. This concern over the potential diversion of military equipment was the initial focus of the overall investigative effort concerning Mr. Textor.

On February 2, 1988, Mr. Textor wrote to newly-inaugurated President George

---

1. The Court declines to engage in a *de novo* review of the administrative record which is warranted pursuant to *National Organization for Women, Washington, D.C. Chapter v. Social Security Administration of the Department of Health and Human Services*, 736 F.2d 727 (D.C. Cir.1984), since the Court finds that the debarment hearing officer's factfinding procedures were not so deficient as to warrant the Court's deciding questions of credibility already decided by the hearing officer.

Bush, urging him to clean up the waste which he had observed at these auctions. He complained that DOD was auctioning off as "surplus" many items which had never been used and was receiving considerably less money than it should have been. By a letter dated March 24, 1989, an official at the Defense Logistics Agency, to which Mr. Textor's letter had been sent for a response, acknowledged receipt of Mr. Textor's letter. The response stated that it was "interim" in nature because "it will be necessary for us to make extensive inquiries in order to fully address your concerns." A "full response" was promised by May 10, 1989.

The Defense Logistics Agency sent a follow-up, one-page letter dated May 24, 1989, which described in general terms DOD's program for disposing of surplus property, but did not address plaintiff's core concern about items being sold for too little return to the government.

Also that day, the DOD sent plaintiff another letter, this one stating that proceedings to debar him from government auctions for up to three years had been initiated. The letter indicated that the proceedings were initiated based on five incidents where he allegedly engaged in collusive and anti-competitive activity. The letter indicated that there was evidence to debar him pursuant to 48 C.F.R. § 9.406–2.[2]

The plaintiff answered these charges by letter dated June 4, 1989, by either denying the allegations or disputing the DOD's characterization of his activities.

On July 14, 1989, columnists Jack Anderson and Dale Van Atta wrote a column on the plaintiff's case, criticizing the DOD for waste at auctions.

On August 18, 1989, the plaintiff wrote another letter to the DOD which noted certain factual disputes between the investigators' versions of events and his own. Plaintiff also expressed the view that the debarment proceedings were initiated in retaliation for his letter to the President and for the Anderson column.

In early September 1989, plaintiff's counsel spoke by telephone with Bruce W. Baird, who would be hearing the case against the plaintiff, and David Norris, who would be prosecuting it. During the conversation, Messrs. Baird and Norris stated that the DOD was scheduling hearings on the 13th, 14th and 15th of that month on plaintiff's case and that the hearing would be conducted in Battle Creek, Michigan, the headquarters of DRMS. Plaintiff asked that the hearing be held in the Washington, D.C. area since all of the people being charged lived in the Mid–Atlantic area and the allegedly collusive behavior all took place near Washington. Messrs. Baird and Norris explained that the DOD did not have the funds to fly them both to Washington since it was nearing the end of the agency's fiscal year and funds were limited. They informed plaintiff that the DOD *did* intend to fly Messrs. Lusk and Christiansen to Battle Creek to testify against him—(Mr. Lusk from Miami and Mr. Christiansen from Philadelphia). Plaintiff's counsel was informed that it would be impossible to schedule the hearing at any other time or place because Mr.

---

**2.** 48 C.F.R. § 9.406–2(b) and (c) state that a contractor may be debarred for the following reasons:
  (b) Violation of the terms of a Government contract or subcontract so serious as to justify debarment, such as—
  (1) Willful failure to perform in accordance with the terms of one or more contracts; or
  (2) A history of failure to perform or of unsatisfactory performance of one or more contracts.
  (c) Any other cause of so serious or compelling a nature that it affects the present responsibility of a Government contractor or subcontractor.

The plaintiff allegedly breached the "certification of independent price determination" paragraph which appears in DLA's "Sale by Reference" pamphlet, which sets out the instructions, terms and conditions normally used in DOD auctions. That paragraph states that by submitting a bid or joint bid, a bidder certifies that the "prices in this bid or proposal have been arrived at independently, without consultation, communication or agreement, for the purpose of restricting competition, as to any matter relating to such prices, with any other bidder or offeror or with any competitor."

Lusk, one of the witnesses, would be leaving the country for Bolivia on the 18th of September to work in the government's anti-drug efforts and would be unavailable after that date.[3] They, consequently, rejected plaintiff's request that the hearing be held in the Washington, D.C. area.

In a September 13, 1989 letter, Mr. Textor, through his attorneys, wrote that he accepted the terms under protest.

A hearing was conducted by conference call on September 14, 1989 with Messrs. Lusk and Christiansen testifying in Battle Creek and plaintiff in Washington, D.C.

At the hearing, the following five charges were considered:

(a) On January 27, 1987, at Auction 27–7103, at Fort Belvoir, VA, the plaintiff related to a registered source (informant) that he had made some deals with other people at the auction and didn't want them to think he was double crossing them by talking with the source.

(b) On September 3, 1987, at Auction 27–7452, at Fort Belvoir, VA, the plaintiff was observed by an undercover agent entering into a collusive bidding arrangement with Phyllis S. Miller. He related to the agent that he had agreed to give Ms. Miller two items from lot 70 for not bidding against him on the lot. During the auction, the auctioneer stopped the auction and strongly admonished two bidders who were engaged in collusive bidding activities, stating "That's illegal, you cannot do that in this auction. It is a Federal crime to do that. You can go to the Crossbar Hotel." The plaintiff related to the undercover agent that the auctioneer's statement was a joke. Everybody got together on bids.

(c) On September 16, 1987, at Auction 27–7511, DRMO Fort Meade, MD, Plaintiff entered into a collusive bidding agreement with a registered source on lot 83 where source agreed not to bid against him. If plaintiff was the suc-

cessful bidder, source would pay half of the purchase price of the lot. He and source would each keep one of the items and split profits on the sale of the remaining items. Plaintiff was the successful bidder on lot 83 for $550.

(d) On September 28, 1987, in a general business conversation with a registered cause, Plaintiff stated that he could make bidding agreements with Phyllis S. Miller. He stated that he paid her in the past not to bid against him on particular items, but he usually just worked out an agreement not to bid respectively on certain lots.

(e) On October 7, 1987, at Auction 27–8005, DRMO Fort Belvoir, VA, Plaintiff entered into a collusive bidding agreement with a registered source on lot 16. Source agreed not to bid against him on the lot. If Plaintiff was the successful bidder, he agreed to sell source items from the lot for $20. Plaintiff was the successful bidder on lot 16 for $150.

With respect to the September 16, 1987 incident, Mr. Lusk testified that plaintiff introduced his proposal for what plaintiff calls a "joint bid" with the statement, "Let's work together on it. Let's not run each other up." Mr. Lusk's debriefing did not include this particular statement. Mr. Christensen's debriefing of that day characterized the arrangement in question as an offer by the plaintiff to "collusively bid." Mr. Christensen did not memorialize the discussion in the degree of detail provided by Mr. Lusk.

The plaintiff's testimony concerning this incident was somewhat confused. In his own testimony, the plaintiff did not deny saying "let's not run each other up." Rather, he indicated that he did not recall *Mr. Lusk* making such a statement. The plaintiff indicates that this was a misunderstanding and the plaintiff was merely responding specifically to the question

---

**3.** In addition, the government contends that Messrs. Baird and Norris informed plaintiff's counsel that they were not going to agree to moving the situs of the hearing for fear of its precedential impact. If they moved the hearing for Mr. Textor, they would be required to hold

hearings all across the country solely for the convenience of those proposed for debarment. The plaintiff denies that this reason was given by Messrs. Baird and Norris at the time of the conversation.

asked—whether he remembered Lusk making such a statement at the hearing. Further, the testimony indicated that Mr. Lusk and the plaintiff each had the intention, prior to plaintiff's approaching Mr. Lusk, to bid independently on and win the lot of five machines, retain one machine for personal use and sell the remainder.

With respect to the September 28, 1987 incident, a verbatim transcript of plaintiff's telephone call to Mr. Lusk concerning the plaintiff's bidding agreements with Ms. Phyllis Miller was offered in evidence at the hearing. Mr. Lusk's testimony was corroborated by Mr. Christensen's debriefing of September 16, 1987. According to the transcript, plaintiff stated, "[I]f you pay her something, you know, like 50 bucks or something she won't bid against you. But I don't like to do that particularly.", that "Usually I work it out without having to pay anything" and "what's happened in the past, she'll lay off an item and I'll lay off an item." Later in the conversation, the plaintiff was asked whether he "worked with" Ms. Miller, and when the plaintiff answered he would "lay off" an item and that Ms. Miller would lay off an item, Mr. Lusk responded, "Oh. Just trade them."

At the hearing, the plaintiff testified that the recorded conversation took place at a time when he suspected that Mr. Lusk was a government informant. The plaintiff testified that since Mr. Lusk was constantly pestering him about ways to deal with Ms. Miller, the plaintiff blew up at Mr. Lusk because of this hectoring and, in sarcastic fashion, tried to steer Mr. Lusk towards Ms. Miller and away from himself. He denied ever having paid Ms. Miller or having "laid off" an item so that she could bid on it without him competing against her.

As to the October 7, 1987 incident, Mr. Lusk testified that the plaintiff approached Mr. Lusk with regard to lot 16 (a mixed lot of hardware) and offered to sell Mr. Lusk the item he desired from the lot for $20 if Mr. Lusk would not bid on the lot. The transcript of Lusk's debriefing supported this testimony. In response, the plaintiff testified that he had noticed that Mr. Lusk had circled that lot on his program and written $20 in the margin, adding:

I told him that I was going to bid on that lot. I did not tell him how much I was going to bid on it, and he said that he would not bid on that lot if I would sell him an item for $20, and I said that I really didn't care. I paid $150 for that lot. Mr. Lusk never would have gone that high, so he didn't even pose any threat to me.

The plaintiff added that he obtained the lot for $150, that Mr. Lusk never bought anything out of the lot from him, and that he never collected the $20.

After the conclusion of the hearing, the plaintiff submitted a post-hearing brief which dealt with each charge in the following manner:

(a) The plaintiff responded that Lusk did not testify as to what the alleged deals were.

(b) The plaintiff responded that the lot was purchased without any "deal" with Phyllis Miller. Any comment he may have made regarding the auctioneer's statement had been taken out of context and was meant as a joke.

(c) The plaintiff responded that the purchase of lot 83 was through a bona fine joint venture, not an anti-competitive agreement. He denied ever saying "Let's not run each other up." He noted that this statement was not memorialized in Mr. Christensen's debriefing transcript.

(d) The plaintiff responded that he recalled a conversation with Lusk dealing with Phyllis Miller, but cannot recall the details. He responded that the statements made during the telephone conversation, taken in context, do not evidence collusive activity.

(e) The plaintiff responded that his purchase of lot 16 did not involve any anti-competitive agreement.

By a letter dated March 7, 1990, Mr. Baird informed the plaintiff that he had been debarred for three years and that the debarment was effective through May 23, 1992. A memorandum of decision accompanied the letter. The decision, in brief,

stated that the evidence regarding charges a and b was "neither clearcut, nor particularly enlightening...." Accordingly, the hearing official held those charges to be unproven.

In regard to charges c and e, the hearing official stated that he considered and rejected the plaintiff's arguments that these agreements were bona fide joint ventures. He stated the following:

> The view of the Defense Criminal Investigative Service, restated as charges c and e in the notice of proposed debarment, is that these arrangements were collusive bidding agreements.

The Memorandum of Decision stated that it was not shown that the plaintiff could not have afforded either of the lots in question without engaging Lusk as a joint venturer. There was no element of risk-sharing involved. The decision indicated that Mr. Lusk's testimony regarding the plaintiff stating, "Let's not run each other up" was credible and that the hearing officer believed this testimony.

With regard to charge d, the decision indicated that the hearing officer took the conversation transcript at face value and held that in the conversation, the plaintiff admitted to engaging in collusive, anti-competitive activity with Phyllis Miller. In regard to the plaintiff's position that in the conversation he was being a "sarcastic smart aleck" in making the statements, the hearing officer held:

> I am unable to credit this testimony by Mr. Textor. The weight of the evidence is that the agreements into which he entered with other bidders were for the purpose of suppressing competition and reducing the price obtained by the Government for its surplus property.

Accordingly, Mr. Baird considered charges c, d and e to be proven. Mr. Textor's debarment officially began on May 24, 1989.

## DISCUSSION

### I. *The Standard of Review*

■ This case has been brought pursuant to the Administrative Procedure Act.

The plaintiff can prevail in this case if he can show that the debarring official's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A). The Court's application of the arbitrary and capricious standard has been substantively equated with the inquiry whether there was "substantial evidence" to debar the plaintiff. In *Association of Data Processing Serv. Orgs., Inc. v. Board of Governors of the Fed. Reserve Sys.*, 745 F.2d 677 (D.C.Cir.1984), the D.C. Circuit held the following:

> [W]hen the arbitrary and capricious standard is performing that function of assuring factual support, there is no *substantive* difference between what it requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense. . . .

*Id.* at 683–84 (original emphasis).

The Court must, therefore, review the entire administrative record to determine whether there was a rational basis for the agency's action. *See Caiola v. Carroll*, 851 F.2d 395, 398 (D.C.Cir.1988). The standard is not whether this Court would have acted differently. Rather, the Court must determine whether the decision was rational and based on the consideration of all relevant factors. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

### II. *Consideration of Matters Outside the Administrative Record*

■ The plaintiff urges this Court to not only consider the administrative record of Mr. Textor's debarment; but also consider the debarment proceedings of Ms. Phyllis Miller, the bidder who the plaintiff allegedly "conspired" with in the September 28, 1987 incident. Defendants object to any attempt to inject these facts into the Court's analysis because these facts were not part of the record before the debarring official.

In *Caiola v. Carroll,* 851 F.2d 395 (D.C. Cir.1988), the Court of Appeals required the debarment official to reconcile his decision in three separate debarment proceedings which presented essentially identical facts. In *Caiola,* three officers of an indicted corporate government contractor were proposed for debarment pursuant to the Federal Acquisition Regulation ("FAR"), codified in 48 C.F.R., chapter 1, which was jointly issued by the Department of Defense, the General Services Administration, and the National Aeronautics and Space Administration. The FAR "[p]rescribes policies and procedures governing the debarment and suspension of contractors by agencies...." 48 C.F.R. § 9.400(a)(1). In *Caiola,* the Court extended the debarment decision to include the debarment of individuals associated with corporate government contractors when there is evidence that the individual participated in, knew of, or had reason to know of the contractor's conduct which formed the basis of the debarment of the contractor. In this case, the DLA's debarring official, faced with three corporate officials in essentially the same position, debarred two and did not debar one. The Court of Appeals held that "[s]ince there was no basis for the simultaneous findings that James Caiola and Elsa DeAngelis had 'reason to know' of the unlawful conduct while Edward Lodge did not, the agency has acted unreasonably."

The Court of Appeals' opinion in *Caiola* does not compel this Court to consider the administrative record of the debarment proceedings against Ms. Phyllis Miller. In *Caiola,* all of the individuals proposed for debarment were being debarred for exactly the same activity—being officers in a particular company. All were alleged to have the same level of culpability. This is not the case with Mr. Textor and Ms Miller. Even on the incomplete record before the Court, it is clear that Mr. Textor and Ms. Miller are not in identical positions. Furthermore, the differences in the positions taken by Mr. Textor and Ms. Miller in their debarment hearings warrant different treatment. Throughout the debarment proceeding, Mr. Textor maintained that his actions were neither illegal nor anti-competitive. He holds this position to this day. Ms. Miller, on the other hand, accepted responsibility for her actions and promised not to engage in any similar activities. Unequal treatment of Ms. Miller and Mr. Textor is certainly understandable given Ms. Miller's acceptance of guilt. Therefore, this Court need not consider the entire record of Phyllis Miller's debarment to decide whether the government's debarment of Mr. Textor was arbitrary and capricious.

### III. *Standard of Proof in Debarment Proceeding*

■ Upon a consideration of the administrative record in Mr. Textor's debarment, the Court holds that the charges of which Mr. Textor was found guilty were supported by sufficient evidence and the three-year debarment was within the reasonable range of the hearing officer's discretion.[4]

**4.** The parties disagree as to the standard of proof that must be applied in a debarment proceeding. The defendant contends that the debarment must be established only by a preponderance of the evidence. They point to the letter sent to the plaintiff informing him of the charges against him. The letter referred to § 9.406–2(c) of the Federal Acquisition Regulations, 48 C.F.R. § 9.406–2(c), which provides for debarment for any cause that affects the present responsibility of a contractor (or, in this case, a bidder at a surplus property auction). FAR § 9.406–3(d)(3), in turn, specifies that the standard of proof in these cases which do not involve criminal convictions is *preponderance of the evidence.* This standard of proof was applied in *Leitman v. McCausland,* Civil Action No. 90–1268 (E.D.Va. June 27, 1990). This standard of proof was also applied in *Caiola v. Carroll.*

The plaintiff, on the other hand, points to the same letter to plaintiff which also referred to DOD Manual 4160.21–M, and to the debarment decision which stated that the decision was reached pursuant to the authority given by the DOD Manual and pursuant to the procedures of the FAR. The plaintiff asserts that the DOD Manual, which requires "clear and convincing evidence" of a contract violation, controls the debarment procedure.

The plaintiff has been unable to point to a single case holding that the clear and convincing evidence standard is applied in debarment proceedings. Given the paucity of authority for the plaintiff's position, this Court will follow other debarment cases which have held that

## IV. *Sufficiency of the Evidence*

■ Since the plaintiff admitted to most of the informant's versions of what was said in the three key conversations with the exception of the "laying off" language, the plaintiff's primary argument in his challenge to the debarment is that the hearing official could not have found that the joint bidding arrangement was anti-competitive. The plaintiff explains that the nature of the lots sold at the government auctions makes individuals "go in together" to purchase the lot, each then taking the individual items that the individual bidder wants. However, the arrangements described by the plaintiff do not appear to be joint ventures. Both bidders did not contribute money to buy the lot. As the Memorandum of Decision states, there appears to be no element of risk-sharing. The hearing officer was convinced that there was no proof that the plaintiff could not afford to buy the lots in question without an agreement with a competitor to "lay off." Instead, the evidence adduced at the hearing presents a situation more akin to bid rigging. One bidder would agree not to bid on a particular lot in exchange for another bidder's agreement not to bid on another lot. The plaintiff points to no case law finding the type of arrangements described by the evidence at the hearing is *not* anti-competitive, let alone pro-competitive. In fact, bid rigging by buyers at auctions has long been held to be illegal under the Sherman Act. *See Swift & Co. v. United States*, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905); *United States v. Champion International Corp.*, 557 F.2d 1270 (9th Cir.), *cert. denied*, 434 U.S. 938, 98 S.Ct. 428, 54 L.Ed.2d 298 (1977).

In support of his analysis that his alleged conduct was not anti-competitive, the plaintiff points to a DOD official's declaration, presented by Phyllis Miller in her debarment proceeding, interpreting the "certification of independent price determination" provision in the DLA's "Sale by Reference" pamphlet that the "going in"/joint bidding arrangements were legitimate arrangements. The declaration, however, makes no assessment of the competitive nature of the activities similar to those of Mr. Textor. A close examination of this testimony reveals that it really presents no opinion as to the anti-competitive nature of the bidding practice:

> ... multiple bidding and/or bidding by joint ventures, whether disclosed or otherwise, did not violate the provision *as long as the bidding arrangements were not designed to restrict competition, and otherwise served a legitimate business interest.* (emphasis added)

Therefore, even this testimony from Ms. Miller's hearing fails to support the plaintiff's position that the joint bidding arrangements of which he is accused are necessarily not anti-competitive, let alone pro-competitive.

Furthermore, it is clear from the Memorandum of Decision that the hearing officer did not credit the plaintiff's explanation concerning his comments concerning his "laying off" arrangements with Phyllis Miller. In addition to not crediting the plaintiff's explanation, Mr. Baird also pointed to the *corroboration* provided by Agent Christensen's September 16, 1987 debriefing report which related that the plaintiff had, at a Fort Meade DRMO sale on that date, admitted to having colluded with Ms. Miller many times.[5]

Given this review of the evidence presented at the debarment hearing, the Court holds that there was sufficient evidence on the issues of whether the alleged activity was anti-competitive and whether the plaintiff indicated that the "agreements" he entered into with fellow bidders required one bidder to "lay off" bidding on a lot on which he/she would otherwise bid.

■ The plaintiff has failed to present evidence that his three-year debarment was

---

debarment need only be supported by a preponderance of the evidence.

**5.** Agent Christiansen's characterization of the plaintiff's activities as collusion is a legal conclusion that carries no force with the Court.

However, since the debriefing report is used here to merely corroborate direct testimony about what the plaintiff said, the Court is considering it for this limited purpose.

excessive and, therefore, retaliatory. The plaintiff argues that his three-year debarment makes no sense in light of Phyllis Miller's six-month debarment. As the Court discussed above, the Court is under no obligation to review Ms. Miller's debarment in reaching its determination concerning Mr. Textor's debarment. However, it was precisely *because* Ms. Miller's case is so drastically different from Mr. Textor's case that plaintiff's argument fails. Ms. Miller is different from Mr. Textor because she admitted her wrongdoing and acceded to the government's conditions. It is most likely because of this cooperation that Ms. Miller's debarment term was shorter. The debarment regulations stress that the debarment should not be considered a punishment. Rather, it is a way of insuring the integrity of the government auction process. Ms. Miller's accession stands as strong evidence that she will not engage in that type of conduct again. The plaintiff's rebellion and insistence that the conduct was not anti-competitive makes him a far less favorable candidate for readmittance.

### V. *"Fundamental Fairness" of the Debarment Procedure*

The plaintiff's final argument is that regardless of the sufficiency of the evidence, the procedure pursuant to which Mr. Textor was debarred violated principles of fundamental fairness. The FAR, at 48 C.F.R. § 9.406–3(b), provides that the debarment hearing must be held in a way "consistent with principles of fundamental fairness." In the plaintiff's case, a hearing was, in fact, held and the DOD provided him with notice of the hearing. Although the Court is sympathetic to the plaintiff's situation and financial constraints, the process by which the plaintiff was debarred comported with principals of fundamental fairness and due process. He was afforded an opportunity to appear with counsel, to submit documentary evidence, to present witnesses, and to confront any person the agency presents. The plaintiff, in fact, was represented by two attorneys and had an unlimited opportunity to testify and to introduce evidence on his own behalf.

The DOD cannot be held to violate Mr. Textor's due process rights simply because he declined to personally confront those witnesses. It is true that the hearing official was less able to evaluate the plaintiff's credibility, but it is unclear, given the information before the hearing officer that this would have made a substantial difference.

Principles of fundamental fairness do not dictate that the hearing must be convenient to the plaintiff. Principles of fundamental fairness under the FAR as well as under the Fifth Amendment require reasonable notice to the plaintiff and an opportunity to present his case. The hearing officer and witnesses need not have come to the plaintiff. In this case, the situs chosen, Battle Creek, Michigan, was not an arbitrary one. It is the location of DRMS headquarters and the place of duty of the Chief Counsel of DRMS who, in addition to managing a legal office of 13 attorneys and serving as principal legal advisor to the Commander of this worldwide defense agency, also serves as a debarring official.

Therefore, the Court holds that the process by which the plaintiff was debarred comported with principals of fundamental fairness and the due process requirements of the Fifth Amendment.

### VI. *Conclusion*

For the reasons set forth above, the Court holds that there was sufficient evidence to find that Mr. Textor engaged in anti-competitive activity in violation of the FAR. The three-year debarment, entirely within the hearing official's discretion, was reasonable given the plaintiff's lack of remorse. Finally, the procedure afforded Mr. Textor reasonable notice and opportunity to present his case. This procedure comports with the principles of fundamental fairness as set out in the FAR and the Fifth Amendment. The plaintiff's motion for summary judgment is denied, therefore, and the defendant's motion for summary judgment is granted.

### ORDER

In accordance with the reasons set forth in the Court's Memorandum Opinion issued

January 29, 1991, it is this 29th day of January, 1991, hereby

ORDERED that

1) Plaintiff's Motion for Summary Judgment shall be denied;

2) Defendant's Cross–Motion for Summary Judgment shall be granted;

3) Plaintiff's claim shall be dismissed with prejudice.